Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH AMANN, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>METRO BANK PLC, VERNON W. HILL, II, CRAIG DONALDSON, MIKE BRIERLEY, AND DAVID ARDEN,<br><br>        Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Joseph Amann ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, wire and press releases published by and regarding Metro Bank PLC

- 1 -

Class Action Complaint for Violation of the Federal Securities Laws

("Metro Bank" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Metro Bank from March 6, 2018 through May 1, 2019, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the misleading statements entered into this District.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

Class Action Complaint for Violation of the Federal Securities Laws

## PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant Metro Bank, together with its subsidiaries, provides retail and commercial banking services in the United Kingdom. The Company's securities are traded Over-The-Counter ("OTC") under the ticker symbol "MBNKF."

8. Defendant Vernon W. Hill, II ("Hill") is the founder and Chairman of the Board of Directors of Metro Bank.

9. Defendant Craig Donaldson ("Donaldson") has served as the Company's Chief Executive Officer ("CEO") throughout the Class Period.

10. Defendant Mike Brierley ("Brierley") served as the Company's Chief Financial Officer ("CFO") and Company Secretary from the beginning of the Class Period until March 29, 2018.

11. Defendant David Arden ("Arden") has been the Company's CFO since March 29, 2018.

12. Defendants Hill, Donaldson, Brierley, and Arden are sometimes referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants:

   a. directly participated in the management of the Company;

   b. was directly involved in the day-to-day operations of the Company at the highest levels;

   c. was privy to confidential proprietary information concerning the Company and its business and operations;

   d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

- 3 -

e.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  approved or ratified these statements in violation of the federal securities laws.

14.  The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.  The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.  The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

17.  The Prudential Regulation Authority (the "PRA") is the financial services regulatory body in the United Kingdom. The PRA's rules require financial firms to hold sufficient capital and have adequate risk controls in place. The PRA is part of the Bank of England and supervises over 1,500 financial institutions, including banks and insurance companies.

18.  The Financial Conduct Authority (the "FCA") is another financial regulatory body in the United Kingdom. The FCA works with firms to ensure fair outcomes for consumers. One responsibility of the FCA is regulating and ensuring fair practice in consumer credit.

19.  Risk Weighted Assets ("RWAs") are used to determine the minimum amount of capital that a bank or financial institution must hold to reduce the risk of

Class Action Complaint for Violation of the Federal Securities Laws

insolvency. The higher the RWAs, the more capital regulators require a bank or financial institution to set aside.

**Materially False And Misleading Statements Issued During the Class Period**

20.    On March 6, 2018, Metro Bank published its Annual Report and Accounts 2017 (the "2017 Annual Report"). The 2017 Annual Report included a Chairman's Statement by Defendant Hill, a Chief Executive Officer's Statement by Defendant Donaldson, and a Corporate Governance Overview by Defendant Brierley.  The 2017 Annual Report included a description of the Company's risk management policies, stating in relevant part:

> Our risk management policies and controls are reviewed regularly to reflect changes in market conditions, regulations, and our activities. Through regular training and additional standards, guidance and procedures, we aim to develop a robust and effective control environment in which all our colleagues understand their roles and obligations.

21.    The 2017 Annual Report also reported the Company's capital structure, including its RWAs, stating in relevant part:

| Capital structure | 2017 £m | 2016 £m | Change % |
|---|---|---|---|
| Common Equity Tier 1 ('CET1') Capital | 896.9 | 651.4 | 37.7% |
| Risk weighted assets ('RWAs') | 5,881.8 | 3,590.4 | 56.7% |
| CET1 ratio | 15.3% | 18.1% | 230bps |
| Regulatory leverage ratio | 5.5% | 6.5% | (110)bps |
| Leverage | 6.7% | 8.0% | (130)bps |

22.    The 2017 Annual Report's notes to the financial statements included a section on capital management and regulation, stating in relevant part:

Capital management

Capital is held to protect our depositors, cover our inherent risks, provide a cushion for stress events and to support our business strategy. In

Class Action Complaint for Violation of the Federal Securities Laws

assessing the adequacy of our capital resources, we consider our risk appetite, the material risks to which we are exposed and the appropriate strategies required to manage those risks. We prepare an annual Internal Capital Adequacy Assessment Process document that sets out how we identify and manage the key risks to which we are exposed and details our capital requirements, capital resources and capital adequacy over the planning period. We produce regular reports on the current and forecasted level of capital, as well as the results of stress scenarios, to the Board and the Executive Leadership Team (chaired by the Chief Executive Officer). The key assumptions and risk drivers used to create the stress tests are regularly monitored and reported. ***We manage capital in accordance with prudential rules issued by the PRA and FCA, in line with the EU Capital Requirements Directive.*** In June 2013 the European Parliament approved new capital reforms (referred to as 'CRD IV'), which implements Basel III in Europe. CRD IV legislation has been effective from 1 January 2014. We are committed to maintaining a strong capital base under both existing and future regulatory requirements. During the year we complied with all externally imposed capital requirements to which we are subject.

(Emphasis added).

23.     On April 23, 2019, Metro Bank published its Annual Report and Accounts 2018 (the "2018 Annual Report"). The 2018 Annual Report included a Chairman's Statement by Defendant Hill, a Chief Executive Officer's Statement by Defendant Donaldson, and a Corporate Governance Overview by Defendant Arden. The 2018 Annual Report included a description of the Company's risk management policies, stating in relevant part:

Risk management policies

We've established our risk management policies to identify and analyse the risks we face, to set appropriate risk limits and controls, and to monitor risks and adherence to limits. The Risk team regularly reviews these policies and controls to verify compliance and to reflect changes in market conditions and our activities. We use training and management standards

- 6 -

and procedures to develop a robust and effective control environment – one where all colleagues understand their roles and obligations.

24.     The 2018 Annual Report's notes to the financial statements contained a section discussing capital management, stating in relevant part:

Capital is held to protect our depositors, cover our inherent risks, provide a cushion for stress events and to support our business strategy. In assessing the adequacy of our capital resources, we consider our business plan, risk appetite, the material risks to which we are exposed and the appropriate strategies required to manage those risks. We prepare an annual Internal Capital Adequacy Assessment Process document that sets out how we identify and manage the key risks to which we are exposed and details our capital requirements, capital resources and capital adequacy over the planning period, including under stress scenarios. This process is used to ensure that we apply appropriate management buffers to regulatory capital requirements in line with risk appetite.

In order to appropriately monitor and manage the Bank's capital resources, we produce regular reports on the current and forecasted level of capital for the Board and the Executive Leadership Team (chaired by the Chief Executive Officer). The key assumptions and risk drivers used to create the stress tests are regularly monitored and reported, and are used in determining how we will evolve our capital resources and ensure they are appropriate for growth.

***We manage capital in accordance with prudential rules issued by the PRA and FCA, in line with the EU Capital Requirements Directive.*** In June 2013 the European Parliament approved new capital reforms (referred to as "CRD IV"), which implements Basel III in Europe. CRD IV legislation has been effective from 1 January 2014. We are committed to maintaining a strong capital base under both existing and future regulatory requirements.

The strength of our capital base is dependent upon the size of our capital relative to Risk Weighted Assets. In January 2019, we announced that we had adjusted the risk weighting of certain commercial loans secured on commercial property and certain specialist buy-to-let loans that had the combined effect of increasing our RWAs by £900 million. Whilst the risk weightings have been adjusted, there is no deterioration in the credit

Class Action Complaint for Violation of the Federal Securities Laws

quality of the affected assets. We are learning the lessons from this and will continue to improve our systems and controls around capital and risk-weighted assets.

(Emphasis added).

25.     The statements referenced in ¶¶20-24 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Metro Bank misclassified the risk terms of many of its loans; (2) accordingly, Metro Bank failed to maintain sufficient capital; (3) this conduct would lead to investigations by the PRA and FCA; (4) this conduct would also lead to the reduction of deposits at Metro Bank from larger commercial and partnership clients; and (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

## The Truth Begins To Emerge

26.     On January 23, 2019, Metro Bank revealed that it misclassified the risk of hundreds of millions of pounds of loans. Metro Bank issued a press release "Metro Bank Announces FY 2018 Results Preview And Trading Update" which stated in relevant part:

*Recent trading*
Trading in the fourth quarter continued the trends witnessed in the first three quarters led by over 100,000 new customer accounts joining the bank. During the fourth quarter we opened stores in Bath, Crawley, Northampton, Putney, Ashford, and Piccadilly and neared completion of Moorgate, which opened in early January. Metro Bank now has 66 stores ranging from Canterbury in the East to Bristol in the West of England with a further seven stores in advanced planning stages or under construction.

Class Action Complaint for Violation of the Federal Securities Laws

Deposits reached £15.7bn as at 31 December 2018, an increase of 34% vs 2017, following quarterly growth of £848m. Deposit growth per store per month for 2018 was £5.9m (2017 £6.3m). Customer loans totaled £14.2bn, an increase of 48% vs 2017, following quarterly growth of £1.1bn. Total assets were £21.7bn, an increase of 32% vs 2017. ***Risk weighted assets at full year are expected to be approximately £8.9bn with the increase driven by both net loan growth and an adjustment in the risk weighting of certain commercial loans secured on property and certain specialist BTL loans to large portfolio landlords***. Total capital ratio is expected to be approximately 15.8% as at December 31 2018.

Underlying profit before tax of £50m for 2018 grew by 138% vs 2017, but softened as the last quarter progressed. Management intends to give an update on outlook at the full year results on 27 February 2019.

 (Emphasis added).

27.     Further, on January 23, 2019, multiple media reports elaborated on this disclosure, including *The Guardian* with its publication of the article, "Metro Bank shares crash after loans blunder revealed," which stated in relevant part:

Metro Bank has revealed a major blunder in how it classifies its loan book, an admission that drove its share price down by nearly 40% on Wednesday, wiping £800m off the value of the company.

***The bank, which has been opening new branches as established rivals cut back, revealed that hundreds of millions of pounds of commercial property loans and loans to commercial buy-to-let operators had been wrongly classified in risk terms, and should have been among its "risk-weighted assets" (RWAs).***

After the blunder emerged, Metro's shares plummeted 39% from £22 to close at £13.45 as analysts feared the bank might have to raise fresh capital, just six months after tapping shareholders for £300m to finance its rapid expansion plans. When a bank has higher risk-weighted assets, regulators require higher amounts of capital to be set aside.

- 9 -

Class Action Complaint for Violation of the Federal Securities Laws

Metro launched in 2010 and has opened new banking halls in city centres across the south of England. It floated on the stock market in March 2016 at £20 a share, which rose to more than £40 a share in March last year, but has since been falling.

Metro Bank chief executive Craig Donaldson said "credit quality has remained robust" and that "notwithstanding the RWAs, the bank continues to do well".

The company said it had called in a "big four" accountancy firm to audit the loan classification, and had immediately reported the issue to the Prudential Regulatory Authority, one of the successors to the Financial Services Authority.

When Metro Bank reassessed its loan portfolios, it found that around a 10th of its £14.5bn loan book had been given incorrect risk weightings.

It found that many of the commercial property loans had been assigned a 50% risk weighting when they should have been 100%. The situation was worse in the commercial buy-to-let book, where many loans had been given a 35% risk weighting when they should have been 100%.

The bank also revealed that tougher trading conditions meant underlying profits for 2018 were £50m, significantly below expectations of £59m but 136% up on a year earlier.

Mortgage margins have been hit by harsher competition in the sector and general uncertainty in the property market over Brexit, it said.

(Emphasis added.)

28.    *Bloomberg* published the article, "Metro Bank Plunges on Misclassified Assets, Capital Concerns" which stated in relevant part:

Metro Bank Plc fell the most since going public after applying an incorrectly low risk weighting to parts of its loan book, with the British lender's chief saying he doesn't know how long the mortgages in question had been wrongly classified.

- 10 -

The shares plunged as much as 34 percent Wednesday and the bank's bonds also fell on concern it will need to raise more capital as a result. Metro Bank, founded to challenge Britain's big lenders almost a decade ago by U.S. entrepreneur Vernon Hill, also said profit "softened as the last quarter progressed."

"It was a misinterpretation of the rules," and the misclassification dates back through 2018 at least, Craig Donaldson, Metro Bank's chief executive officer, said by phone. "We are putting it right," he said, calling it an "isolated incident" that didn't affect the bank's earnings. He said the bank has been in communication with Britain's Prudential Regulation Authority. The bank previously put a 50 percent risk weighting on its commercial mortgages, but said it has now increased this to the correct level of l 00 percent, a spokesperson for the lender said. For buy-to-let mortgages, the portfolio had been held at a risk weighting of 35 percent, but this has also been increased to l 00 percent.

29.     On this news, shares of Metro Bank plummeted $10.00 per share or nearly 35% to close at $18.80 per share on January 23, 2019, damaging investors.

30.     On January 31, 2019, the *Financial Times* published the article, "Metro Bank bosses under fire over accounting error" which reported that the realization of the accounting errors was not based on Metro Bank's own self reporting, as they previously framed it, but rather in response to the PRA's concerns with Metro Bank's loans. The article stated in relevant part:

Metro Bank faced growing pressure over its handling of an accounting mistake on Thursday, with investors, industry figures and regulatory experts suggesting senior executives would be forced to resign amid fears they may have misled the market.

The bank last week revealed it had misclassified large numbers of commercial loans when calculating risk-weighted assets, meaning it did not have as much capital against them as it should have.

Chief executive Craig Donaldson repeatedly said at the time that the mistakes were "something we found as we went through our end-of-

- 11 -

year reviews". ***But on Thursday the bank admitted the potential problems had been pointed out by regulators at the Bank of England.***

***The BoE's Prudential Regulation Authority, which supervises large banks and insurers, informed Metro of suspected issues in some parts of its loan book, prompting a wider internal review that discovered the full extent of the mistakes.*** Analysts first raised concerns about the issue more than 18 months ago.

*        *        *

A former BoE official said: "You would expect the PRA to be pretty annoyed. The firm has put them in a position where the PRA has come in for criticism when actually they were the ones to point out the error . . . in terms of follow-on enforcement action, the question is when do you pull the trigger. Supervisors will always want to remediate the problem before they refer the matter to enforcement."

(Emphasis added).

31.    On this news, shares of Metro Bank fell $1.70 or over 10.89%, to close at $14.80 per share on January 31, 2019, damaging investors.

32.    On February 27, 2019, the *Financial Times* published an article, "Regulators probe Metro Bank's possible false market creation" which revealed that the PRA and FCA initiated investigations into Metro Bank. The article stated in relevant part:

The regulators probing Metro Bank are focused on how employees miscalculated assets and then potentially created a false market in its shares by providing inaccurate statements to investors, according to people familiar with the matter.

*        *        *

Asked about the regulatory investigations on Wednesday, Metro chief executive Craig Donaldson said he did not know anything about their scope, and some experts were surprised that the two sister regulators had both taken an interest in Metro's problems.

However, according to people familiar with the situation, ***the PRA is focusing on the bank's fundamental accounting error, and how it***

- 12 -

***could miscalculate its risk-weighted assets despite using so-called standardised model that is supposed to be relatively simple.***

Metro had previously hoped to move to a new more tailored model that would cut its capital requirements in 2019, but has now said it does not expect to win approval before the end of next year.

***The FCA, meanwhile is focused on the bank's duties as a listed company to put out accurate statements, according to people familiar with the matter.*** The episode calls this into question in a number of ways: the first hangs on whether a false market in the bank's shares was created if earlier statements put out an overly optimistic picture of the bank's balance-sheet health before the error was detected.

There is also the issue that the bank erroneously gave the impression that the RWA miscalculation had been spotted during its own review, rather than one ordered by the PRA.

***The bank risks separate fines from the PRA and FCA over the incident, and its senior managers could be fined or banned for failings on their watch if wrongdoing is found.***

The PRA's supervisors — rather than its enforcement team — also have discretion to increase the bank's bespoke capital levels under so-called Pillar 2 requirements if it feels the bank takes undue risks.

(Emphasis added).

33.     On this news, shares of Metro Bank fell $3.92 per share or over 22.8% to close at $13.25 per share on February 27, 2019, damaging investors.

34.     On May 1, 2019, Metro Bank held a presentation for the first quarter of 2019 results (the "1Q19 Presentation"). During the 1Q19 Presentation, Defendant Donaldson stated in relevant part:

- 13 -

As we discussed at the full year results in February, 2019 is a year of transition for Metro Bank. And our Q1 results demonstrate the continued momentum of the franchise and the progress in implementing our evolving strategy. ***But Q1 also reflects the challenges from the broader operating environment, as well as some adverse sentiment which we have seen following our trading update from January.***

To go into the specifics, whilst we can report the 19% year on year increase in deposits, ***we have to raise that Q1 saw a 3.6% reduction in our deposits, the result of a small number of commercial and partnership customers reducing deposit balances with us***. However, the momentum in the core retail franchise, and SME customer base has continued with retail deposits actually up £118 million in the quarter. Although we saw some outflows, total deposits actually stabilised in March and we continue to see net growth into April. And whilst we remain committed to our medium term guidance of 20% per annum, ***given the challenge in the first quarter, we expect a more modest rate of deposit growth in 2019 as we catch up what has happened to date.***

(Emphasis added).

35.     It was also announced that the Company's profits were cut in half and a number of large customers ended their relationship with Metro Bank due to the previous misclassification of the loans. Multiple media reports revealed this disclosure, including the *Financial Times* published an article entitled, "Big customers desert Metro Bank over accounting error," which stated in relevant part:

Some of Metro Bank's largest customers left the bank after the discovery of a historic accounting error in the first quarter, damaging growth at the under-fire British lender.

Chief executive Craig Donaldson said "adverse sentiment" had led to the departure of a "small number of large commercial and partnership customers", contributing to a 4 per cent quarter-on-quarter reduction in deposits.

Metro Bank in January revealed that it had miscategorised a large number of commercial loans, meaning it did not have as much capital

- 14 -

against them as it should. The discovery prompted a sharp drop in its stock — it is down 54 per cent since the start of the year — and forced the lender to cut its long-term growth plans.

It is also working on a new share issue to prop up its capital levels, but the bank gave no major update on the hotly-anticipated capital raise alongside its quarterly results, which were reported after markets closed on Wednesday. It noted only that the raise was "anticipated" to be completed in the second quarter.

36.     On this news, shares of Metro Bank plummeted $1.95 per share, or over 18.6%, over the next two trading days to close at $8.50 per share on May 3, 2019, damaging investors.

37.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Metro Bank securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Metro Bank securities were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record

owners and other members of the Class may be identified from records maintained by Metro Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Metro Bank;

- whether the Individual Defendants caused Metro Bank to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Metro Bank securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

Class Action Complaint for Violation of the Federal Securities Laws

Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Metro Bank securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the OTC and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Metro Bank securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

45. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

Class Action Complaint for Violation of the Federal Securities Laws

## COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Metro Bank securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Metro Bank securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

50.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Metro Bank securities. Such reports, filings, releases and statements were materially false and misleading in that

they failed to disclose material adverse information and misrepresented the truth about Metro Bank's finances.

51.   By virtue of their positions at Metro Bank, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

52.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Metro Bank securities from their personal portfolios.

53.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Metro Bank, the Individual Defendants had knowledge of the details of Metro Bank's internal affairs.

54.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Metro Bank. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Metro Bank's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Metro Bank securities was artificially inflated throughout the Class

Period. In ignorance of the adverse facts concerning Metro Bank's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Metro Bank securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

55. During the Class Period, Metro Bank securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Metro Bank securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Metro Bank securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Metro Bank securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

56. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

# COUNT II

## Violations of Section 20(a) of The Exchange Act
## Against The Individual Defendants

58.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.     During the Class Period, the Individual Defendants participated in the operation and management of Metro Bank, and conducted and participated, directly and indirectly, in the conduct of Metro Bank's business affairs. Because of their senior positions, they knew the adverse non-public information about Metro Bank's current financial position and future business prospects.

60.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Metro Bank's business practices, and to correct promptly any public statements issued by Metro Bank which had become materially false or misleading.

61.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Metro Bank disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Metro Bank to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Metro Bank within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Metro Bank securities.

62.     Each of the Individual Defendants, therefore, acted as a controlling person of Metro Bank. By reason of their senior management positions and/or being directors of Metro Bank, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Metro Bank to engage in the unlawful acts and

conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Metro Bank and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

63.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Metro Bank.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 30, 2019                    Respectfully submitted,

                                       **THE ROSEN LAW FIRM, P.A.**

                                       /s/Laurence M. Rosen
                                       Laurence M. Rosen, Esq. (SBN 219683)
                                       355 S. Grand Avenue, Suite 2450
                                       Los Angeles, CA 90071

- 22 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Class Action Complaint for Violation of the Federal Securities Laws