**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
JOHN T. JASNOCH (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

*Counsel for Lead Plaintiffs Angelo Lavdas and Stella Lavdas*

[Additional counsel on signature page.]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANGELO LAVDAS and STELLA LAVDAS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>METRO BANK PLC, VERNON W. HILL, II, CRAIG DONALDSON, MIKE BRIERLEY, DAVID ARDEN, and AILEEN GILLAN,<br><br>Defendants. | Case No. 2:19-cv-04739-TJH-JC<br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMAND |

Lead Plaintiffs Angelo Lavdas and Stella Lavdas (collectively, "Lead Plaintiffs") allege the following based on the investigation conducted by their counsel, which included, among other things: a review of public documents published by Metro Bank PLC ("Metro Bank" or the "Company"); securities analyst reports and advisories about Metro Bank; press releases and other public statements issued by Metro Bank; media reports about Metro Bank; court records; and other public documents. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities fraud class action brought to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired securities of Metro Bank sold under the ticker symbol "MBNKF" on the Over-the-Counter ("OTC") Market in the United States from July 26, 2016 through September 24, 2019, inclusive (the "Class Period"), and who were damaged thereby. Defendants made false and/or misleading statements regarding Metro Bank's capital ratios and/or failed to disclose that: (i) Metro Bank misclassified the risk terms of many of its loans; (ii) Metro Bank's risk weighted assets and Common Equity Tier 1 Capital ("CET1") ratio figures were false and/or misleading; (iii) Metro Bank's

capital was far less robust than represented; and (iv) Metro Bank was not in compliance with applicable banking regulations.

2. Metro Bank is a retail and commercial bank that operates in the United Kingdom ("U.K."). Metro Bank securities trade OTC in the United States under the ticker symbol "MBNKF."[1]

3. The core of Metro Bank's business is the issuance of loans. As of year-end 2018, Metro Bank had net customer loans of £14.2 billion, an increase of 48% from the end of 2017 when it had £9.6 billion. Of those loans, 31%, or £4.4 billion, were commercial, with £2.7 billion commercial property loans and £1.4 billion of professional buy-to-let ("BTL") loans. Moreover, "ensur[ing] a low-risk loan book" is "the foundation of [the Company's] long-term growth."

4. The quality of Metro Bank's loans and the Company's capital levels relative to its level of risk are essential metrics of the Company's financial health relied on by investors, regulators, and bank customers.

5. Banking regulations, including certain measures put in place in response to the recent 2007-2009 financial crisis (hereinafter, the "Financial Crisis") required Metro Bank to properly rate the riskiness of its loans using "risk weights"

---

[1] As of March 10, 2016, the Company's securities also trade on the London Stock Exchange ("LSE") under the ticker symbol "MTRO." For the purpose of this Complaint, when we refer to Metro Bank securities, we refer only to securities traded OTC in the United States under the ticker symbol "MBNKF," unless otherwise noted. Where shares are referred to in media reports, those references are generally to shares that trade on the LSE.

and maintain capital levels sufficient to cover the risk of loss on the bank's loan portfolio.

6. However, in what has been described as a "fundamental accounting error," Metro Bank misclassified a large number of commercial loans secured on property and certain specialist BTL loans as being less risky than they actually were. In fact, Metro Bank held approximately £900 million ($1.1 billion) more in risk-weighted assets ("RWAs") than it had previously stated. This means that Metro Bank's loan portfolio was far riskier than it had represented and that, contrary to the Company's representations, the Company's capital levels were far less robust than represented.

7. Defendants' misclassification of such a large number of loans was particularly egregious because, beginning on or about the middle of 2017, ***about 18 months prior to the Defendants' disclosing the truth, analysts and U.K. regulators alerted Defendants to the risk that the Company*** may be misclassifying its loans.

8. Metro Bank first revealed and admitted to the "miscalculation" of RWAs on January 23, 2019, which resulted in a nearly 35% one-day decline in the price of Metro Bank securities. But amazingly, Defendants chose to pair this dramatic disclosure with another misrepresentation, falsely stating that the problem had been identified and reported by the Company on its own. In fact, as the Company was forced to admit, eight days later, regulators from the Bank of England ("BoE") had raised the issue to them.

9. Defendants' conduct was plainly misleading within the meaning of the Exchange Act. Indeed, the Company and its senior management are currently under investigation by regulators in the U.K. The focus of the investigation is whether Defendants violated "***the bank's duties as a listed company to put out accurate statements***" and whether Defendants created a ***"false market in the bank's shares***" with "***earlier statements [painting] an overly optimistic picture of the bank's balance-sheet health.***" [Emphasis added.]

10. The harm to investors from Defendants' misconduct has been catastrophic. As investors have learned the truth, the Company has lost approximately 90% of its value, customers have abandoned the Company in droves, and the Company has been forced to raise capital.

11. The impact of Defendants' misconduct on the Company's U.S. securities price is reflected in the following charts:






## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

14. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as the misleading statements entered into this District.

15. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities

of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of national securities markets.

16. All of the transactions in the securities that are at issue in this action took place within the United States.

## PARTIES

17. Lead Plaintiffs Angelo Lavdas and Stella Lavdas are U.S. residents. As set forth in their accompanying Certification, Lead Plaintiffs purchased the Company's securities through a transaction on the OTC market in the United States. Lead Plaintiffs purchased the securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

18. Defendant Metro Bank, together with its subsidiaries, provides retail and commercial banking services in the U.K. Metro Bank was founded in 2010 by Anthony Thomson and Defendant Vernon W. Hill, II ("Hill").

19. The Company's securities are traded OTC in the United States under the ticker symbol "MBNKF." The securities trade on an OTC market called the "Pink Open Market," run by OTC Markets Group Inc., located at 300 Vesey Street, 12th Floor, New York, New York 10282. Metro Bank securities started trading OTC on April 27, 2016.

20. The securities that Lead Plaintiffs (and the Class (defined below)) purchased were sold in the United States, in U.S. currency.

21. Lead Plaintiffs incurred irrevocable liability in the United States to purchase the MBKNF securities they acquired during the Class Period. The placement of the buy order, payment of the purchase price, and other related transactions took place within the territorial jurisdiction of the United States.

22. Defendant Hill is the founder and was Chairman of Metro Bank's Board of Directors (the "Board") at all relevant times. Defendant Hill was the Chairman of Metro Bank since its inception in 2010. He stepped down as Chairman as of October 23, 2019. According to the Company's Division of Responsibilities Between the Chairman and Chief Executive Officer, as Chairman, Hill was responsible for the leadership and overall effectiveness of the Board, including ensuring that the Board reviewed all key metrics in line with the agreed business plan and ensuring that stressed scenarios were always in place to support prudent capital planning, liquidity, solvency, recovery, resolution, and risk management, generally. As Chairman, Hill signed the Company's annual reports, which included a section on "Risk Factors and Management," including credit risk.

23. Defendant Craig Donaldson ("Donaldson") served as the Company's Chief Executive Officer ("CEO") at all relevant times. On December 5, 2019, Donaldson agreed to resign as CEO as of January 1, 2020. According to the Company's Division of Responsibilities Between the Chairman and Chief Executive Officer, as CEO, Donaldson was responsible for managing the Company's risk profile, with the support of the Chief Risk Officer ("CRO"), in line with the risk

appetite approved by the Board, and ensuring that appropriate internal and prudential controls were in place, in particular with regard to capital and liquidity. It was also Donaldson's responsibility to ensure effective communication with all shareholders and that appropriate, timely, and accurate information was disclosed to the market, with issues escalated promptly to the Board where appropriate.

24. Defendant Mike Brierley ("Brierley") served as the Company's Chief Financial Officer ("CFO") and Company Secretary from the beginning of the Class Period until March 29, 2018.

25. Defendant David Arden ("Arden") has been the Company's CFO since March 29, 2018.

26. As CFOs, during their respective time periods, Defendants Brierley and Arden were each responsible for reporting on the Company's capital structure, including its CET1 capital, RWAs, CET1 ratio, and other capital ratios.

27. Defendant Aileen Gillan ("Gillan") is Metro Bank's CRO and has served as such at all relevant times. On or about March 12, 2013, Gillan was appointed CRO. As CRO, Gillan is accountable for leading the risk function, which is independent from the Bank's operational and commercial functions. Gillan is responsible for management and oversight of the risk and control framework across the bank. Gillan is also responsible for ensuring that appropriate risk management processes, policies, and controls are in place and that they are sufficiently robust, thereby ensuring that key risks are identified, assessed, monitored, and mitigated.

As CRO, Gillan is also responsible for providing assurance to the Board and directors that the principal risks are appropriately managed and that the Company is operating within its risk appetite.

28. Defendants Hill, Donaldson, Brierley, Arden, and Gillan are collectively referred to herein as the "Individual Defendants."

29. The Individual Defendants were aware, from attending regular meetings and receiving regular reports that addressed Metro Bank's capital requirements, book of loans, RWAs, and CET1 and other capital ratios, of the issues related to risk-weighing the Company's loans. The Individual Defendants were also keenly aware of the regulations that governed how to risk-weigh the Company's loans, particularly because the Company was looking to switch from using the standardized approach to using an advanced internal ratings-based approach ("AIRB") and was lobbying regulators to be permitted to do so. The Individuals Defendants also regularly discussed RWAs in preparation for and in annual reports and in preparation for and during the Company's conference calls held to discuss results, or "Trading Updates." Further, at minimum, beginning on or about mid-2017, the Individual Defendants were on notice of the risk-weight issues when analysts and government regulators started to raise warnings and ask questions. Thus, the Individual Defendants knew, or with deliberate recklessness disregarded, that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the

Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly, or in such a deliberately reckless manner, as to constitute a fraud and deceit upon Lead Plaintiffs and other Class members.

30. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

31. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

32. The Company and the Individual Defendants collectively are referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

33. In addition to its retail banking operations, Metro Bank is in the business of making loans. In 2018, the Company grew its total loans by 48% to £14.2 billion. Of those £14.2 billion loans, 31%, or £4.4 billion, were commercial, with £2.7 billion commercial property loans and £1.4 billion of professional BTL loans.

34. The Company offers "simple lending products that meet the person and business needs of our customers. Our customer-centric underwriting process aims to ensure a low-risk loan book, which is the foundation of long-term growth."

35. The quality of Metro Bank's loans and the Company's capital levels relative to its level of risk are essential metrics of the Company's financial health relied on by investors, regulators, and bank customers.

36. A key aspect of U.K. banking regulation is to ensure that banks are prudently managed by establishing rules to make sure that banks hold enough capital against their outstanding loans to ensure the continuation of a safe and efficient market.

37. The primary source of legislation governing the regulation of banking and financial services in the U.K. is the Financial Services and Markets Act of 2000 ("FSMA") and related implementing legislation and rules. A proportion of the framework is established by European regulations, which are of direct effect in the U.K., including Regulation (EU) 575/2013 on prudential requirements for credit institutions and investment firms ("Capital Requirements Regulation" or "CRR"), together with Directive 2013/36/EU on capital requirements ("Capital Requirements Directive IV" or "CRD IV").

38. CRR and CRD IV implement Basel II and III (collectively, "Basel"). Basel is an internationally agreed set of measures developed by the Basel Committee on Banking Supervision in response to the Financial Crisis. Those regulations

include capital requirements to ensure banks can absorb a reasonable level of losses before becoming insolvent and before depositors' funds are lost.

39. Basel is the main primary source for capital, liquidity, and leverage requirements in the U.K. (as well as the United States). Following the Financial Crisis, the Basel Committee formulated a reformed set of international standards to review and monitor the capital adequacy of banks. These standards compare a bank's assets with its capital to determine if the bank can stand the test of a crisis.

40. A bank's capital ratio is the percentage of the bank's capital to its RWAs. Weights are defined by risk-sensitivity ratios, the calculation of which is dictated under Basel. Basel's capital-to-risk-weighted-assets ratio promotes financial stability and efficiency in economic systems throughout the world.

41. The regulations provide specific instructions on how to calculate "risk-weights" of loans, which directly impact capital requirements. This is particularly true for banks applying the "standardized approach."

42. At all relevant times, Metro Bank was governed by these regulations and should have been using Basel's standardized approach to risk-weights.

43. Risk-weights impact a number of important metrics that banks, particularly Metro Bank, regularly report to investors and the public, including RWAs and the CET1 ratio. RWAs are used to determine the minimum amount of capital that a bank or financial institution must hold. The higher the RWAs, the more capital regulators require a bank or financial institution to set aside. The CET1

ratio is a bank's most secure capital divided by its RWAs and expressed as a percentage. The higher the RWAs, the lower the CET1 ratio will be.

44. The calculation of the amount of capital a bank must have to support its lending, and to comply with regulations, is one of the most fundamental tasks of a bank.

45. The Prudential Regulation Authority ("PRA") is the financial services regulatory body in the U.K. The PRA's rules require financial firms to hold sufficient capital and have adequate risk controls in place. The PRA is part of the BoE and supervises over 1,500 financial institutions, including banks and insurance companies.

46. The Financial Conduct Authority (the "FCA") is another financial regulatory body in the U.K. The FCA works with firms to ensure fair outcomes for consumers. One responsibility of the FCA is regulating and ensuring fair practice in consumer credit.

47. On April 27, 2016, Metro Bank securities started trading OTC in the United States.

## Materially False and Misleading Statements Issued During the Class Period

48. On July 26, 2016, Metro Bank released its "H1 and Q2 Trading Update 2016," stating, in relevant part:

> **Capital ratios remain robust and well above regulatory requirements. *[CET1] as a percentage of risk weighted assets is 21%.***

[Emphasis added and in original.]

49. Also on July 26, 2016, Metro Bank held a conference call to discuss the H1 and Q2 Trading Update 2016. On the call, Defendant Brierley stated, "Clearly we have a very strong capital base. ***We are planning on a fair amount of growth in the coming years and we have the capital to support that growth.***" [Emphasis added.] In response to the question, "how low will our capital ratio get?," Brierly advised that the CET1 ratio would not go below 13.5% in the forecast period.

50. The July 26, 2016, call also included another statement from Defendant Brierley that the Company "see[s] no need for any further diluted capital raises" in the medium term, given the 21% CET1 ratio.

51. On October 26, 2016, Metro Bank released its "Q3 Trading Update 2016," stating, in relevant part:

> **Capital ratios remain robust and well above regulatory requirements. *[CET1] as a percentage of risk weighted assets is 20.4%.*** . . . A move towards the advanced risk based (AIRB) approach in the medium term presents the opportunity to achieve greater capital efficiency.

[Emphasis added and in original.]

52. On February 22, 2017, Metro Bank issued its "Full year results and Q4 Trading Update 2016." Therein, the Company stated that the Company had a

"Strong Common Equity Tier 1 capital ratio at 18.1%." In addition, the Company stated, in relevant part:

> **Capital ratios remain robust and well above regulatory requirements.** ***[CET1] as a percentage of risk weighted assets is 18.1%.*** . . . A move towards the advanced risk based (AIRB) approach in the medium term as well as the potential for Tier 2 debt issuance present an opportunity to achieve greater capital efficiency.

[Emphasis added and in original.]

53. On February 22, 2017, Metro Bank held a conference call to discuss the "Full-Year Results 2016." On the call, Defendant Brierley again reaffirmed that a diluted capital raise would not happen in the medium term, stating:

> Clearly, looking at the capital ratios, they're currently strong. We have more than enough capital to support growth for quite some time to come, but nevertheless I suspect [a debt issuance] might be our next step.

54. On March 2, 2017, Metro Bank published its "Annual Report and Accounts 2016" (the "2016 Annual Report"). The 2016 Annual Report included a "Chairman's Statement" by Defendant Hill, "Chief Executive Officer's Statement" by Defendant Donaldson, "Chief Financial Officer's Statement" by Defendant Brierley, and "Risk Factors and Management" section. The 2016 Annual Report

included a description of the Company's risk management policies, stating, in relevant part:

> [Metro] Bank's risk management policies are established to identify and analyse the risks faced by the Bank, to set appropriate risk limits and controls and to monitor risks and adherence to limits. The risk management policies and controls are reviewed regularly to reflect changes in market conditions and the Bank's activities. Through training and management standards and procedures, the Bank aims to develop a robust and effective control environment in which all colleagues understand their roles and obligations.
>
> * * *
>
> Effective risk management is core to Metro Bank's approach to doing business.

55. The 2016 Annual Report further reported the Company's capital structure, including a 58.8% increase in its RWAs and a 500bps increase of its CET1 ratio, stating, in relevant part:

**Capital structure**

| | 2016 £m | 2015 £m | Change % |
|---|---|---|---|
| Common Equity Tier 1 (CET1) Capital | 651.4 | 299.9 | 117.2% |
| Risk weighted assets (RWAs) | 3,590.4 | 2,261.2 | 58.8% |
| CET1 ratio | 18.1% | 13.1% | 500bps |
| Regulatory leverage ratio | 6.5% | 4.9% | 160bps |
| Leverage | 8.0% | 6.6% | 140bps |

> Capital is held by the Bank to protect depositors, cover inherent risks and provide a cushion in the event of a stress event. Metro Bank is committed to maintaining a strong capital base under both existing and future regulatory requirements. The £400 million capital raise enabled us to continue our growth trajectory through 2016; our CET1 ratio of 18.1% (2015: 13.1%) is well in excess of regulatory requirements.

56. The 2016 Annual Report's notes to the financial statements included a section on capital management and regulation, stating, in relevant part:

> **Capital management**
>
> Capital is held by the Group to protect its depositors, cover its inherent risks, provide a cushion for stress events and to support its business strategy. In assessing the adequacy of its capital resources, the Group considers its risk appetite, the material risks to which it is exposed and the appropriate strategies required to manage those risks.
>
> The Group prepares an annual Internal Capital Adequacy Assessment Process document that sets out how Metro Bank identifies and manages the key risks to which it is exposed and details the Group's capital requirements, capital resources and capital adequacy over the planning period.
>
> ***The Group produces regular reports on the current and forecasted level of capital, as well as the results of stress scenarios, to the Board***

> ***and the Executive Leadership Team (chaired by the Chief Executive Officer). The key assumptions and risk drivers used to create the stress tests are regularly monitored and reported.***
>
> ***The Group manages capital in accordance with prudential rules issued by the PRA and FCA, in line with the EU Capital Requirements Directive.*** In June 2013 the European parliament approved new capital reforms (referred to as "CRD IV"), which implements Basel III in Europe. CRD IV legislation has been effective from 1 January 2014. Metro Bank is committed to maintaining a strong capital base under both existing and future regulatory requirements. During the year the Group has complied with all externally imposed capital requirements to which it is subject.

[Emphasis added and in original.]

57. On April 26, 2017, Metro Bank issued its "Q1 Trading Update 2017" in which it stated that its "**Capital ratios remain robust and well above regulatory requirements.** ***[CET1] as a percentage of risk weighted assets is 15.9%.***" [Emphasis added and in original.]

58. On June 2, 2017, Metro Bank announced that it had completed the purchase of a portfolio of U.K. mortgages from Cerberus European Residential Holdings B.V. ("Cerberus") for £596.7 million. The Company represented that this

portfolio had a "similar credit risk profile to Metro Bank's current mortgage book." Regarding the purchase, CEO Donaldson stated:

> Our lending and deposit growth has gone from strength to strength and the acquisition of this high-quality loan Portfolio supports our high-growth, organic business model as we track ever closer to our 2020 guidance. In particular the acquisition increases the Loan to Deposit ratio to c.78% (2020 guidance c.80%). The Portfolio complements our existing mortgage book and demonstrates our willingness and ability, helped by our strong deposit growth, to take advantage of opportunities as they arise.

59. On July 25, 2017, Metro Bank released its "H1 and Q2 Trading Update 2017," stating that "**Capital ratios remain robust and well above regulatory requirements.** [CET1] as a percentage of risk weighted assets is 13.5%."

60. The same day, Metro Bank released its half year 2017 financial reports in an "Interim Report For the six months ended 30 June 2017" in which CEO Donaldson stated that "Metro Bank is committed to maintaining a strong capital base under both existing and future regulatory requirements."

61. On July 26, 2017, Metro Bank held a conference call to discuss the "Q2 1H Results 2017." On that call, Defendant Hill stated, in relevant part.

> We're [ ] pleased to report that the stock is up 5% from the beginning trade this morning as the response to our offering has been strong in the

> offering and in the aftermarket. ***This has left Metro Bank with a risk capital ratio of 19.4%, probably the highest capital ratio of any bank in the world***, and continues to build our foundation for tremendous growth.

[Emphasis added.]

62. Also on the call, Defendant Brierley discussed the Company's CET1 ratio, stating, in relevant part:

> If we look at the CET1 ratio, however, from Q1 to Q2, you see that's declined from 15.9% to 13.5%. That's due in the main to the strong organic loan growth that Craig was talking about earlier. Of course, ***the portfolio purchase that crystallised on 2nd June, the buy to let portfolio that we purchased from Cerberus***. There is one technical issue in there that's probably worth drawing out as well, which is, most of you know that the Bank is on a standardised method for determining credit risk, but it's also on the standardised method for operational risk as well. Once a year, that operational risk quotient resets, and it resets in the second quarter. And clearly, we're a fast growing bank and, therefore, it resets up because it is based on averages of past years' revenue, and, of course, that's going up quite a lot.

[Emphasis added.]

63. On October 25, 2017, Metro Bank issued its "Q3 Trading Update 2017," wherein the Company reiterated that its "**Capital ratios remain robust and well above regulatory requirements**" and CET1 as a percentage of RWAs was 17.4%, and as of September 30, 2017, RWAs were £5,174 million.

64. On February 21, 2018, Metro Bank released its "Full year results and Q4 Trading Update for 2017." Therein, the Company stated, in relevant part: "**Capital ratios remain robust and well above regulatory requirements. *[CET1] as a percentage of risk weighted assets is 15.3%*.**" [Emphasis added and in original.]

65. Also on February 21, 2018, the Company held a conference call to discuss its "Full Year Results 2017." On the call, Defendant Brierley stated, "we manage our capital ratios conservatively" and "[o]ur internal requirements are super equivalent to what the regulator asks us to hold." Thus, the Company "see[s] no need for an equity raise this year certainly."

66. On March 6, 2018, Metro Bank published its "Annual Report and Accounts 2017" (the "2017 Annual Report"). The 2017 Annual Report included a "Chairman's statement" by Defendant Hill, "Chief Executive Officer's statement" by Defendant Donaldson, "Corporate governance overview" by Defendant Brierley, and "Risk factors and management" section featuring Defendant Gillan. The 2017 Annual Report included a description of the Company's risk management policies, stating, in relevant part:

Our risk management policies and controls are reviewed regularly to reflect changes in market conditions, regulations, and our activities. Through regular training and additional standards, guidance and procedures, we aim to develop a robust and effective control environment in which all our colleagues understand their roles and obligations.

67. The 2017 Annual Report also reported the Company's capital structure, including its RWAs and CET1 ratio, stating, in relevant part:

**Capital structure**

| | 2017 £m | 2016 £m | Change % |
|---|---|---|---|
| Common Equity Tier 1 ('CET1') Capital | **896.9** | 651.4 | 37.7% |
| Risk weighted assets ('RWAs') | **5,881.8** | 3,590.4 | 56.7% |
| CET1 ratio | **15.3%** | 18.1% | 230bps |
| Regulatory leverage ratio | **5.5%** | 6.5% | (110)bps |
| Leverage | **6.7%** | 8.0% | (130)bps |

68. The 2017 Annual Report's glossary defines RWAs as "[a] measure of our assets adjusted for their associated risk. ***Risk weightings are applied in accordance with the Basel Capital Accord*** as implemented by the Prudential Regulation Authority ('PRA')." [Emphasis added.]

69. The 2017 Annual Report's notes to the financial statements included a section on capital management and regulation, stating, in relevant part:

**Capital management**

Capital is held to protect our depositors, cover our inherent risks, provide a cushion for stress events and to support our business strategy.

In assessing the adequacy of our capital resources, we consider our risk appetite, the material risks to which we are exposed and the appropriate strategies required to manage those risks.

***We prepare an annual Internal Capital Adequacy Assessment Process document that sets out how we identify and manage the key risks to which we are exposed and details our capital requirements, capital resources and capital adequacy over the planning period.***

***We produce regular reports on the current and forecasted level of capital, as well as the results of stress scenarios, to the Board and the Executive Leadership Team (chaired by the Chief Executive Officer). The key assumptions and risk drivers used to create the stress tests are regularly monitored and reported.***

***We manage capital in accordance with prudential rules issued by the PRA and FCA, in line with the EU Capital Requirements Directive.***

In June 2013 the European Parliament approved new capital reforms (referred to as 'CRD IV'), which implements Basel III in Europe. CRD IV legislation has been effective from 1 January 2014. We are committed to maintaining a strong capital base under both existing and future regulatory requirements. During the year we complied with all externally imposed capital requirements to which we are subject.

[Emphasis added and in original.]

70. On April 25, 2018, Metro Bank published its "Q1 Trading Update 2018" in which the Company stated:

> **Net loans increased by £1,354m in Q1 driven by organic lending and supplemented by the purchase of a portfolio of UK mortgages for total consideration of £523m.** ***The purchased portfolio*** consists predominantly of seasoned mortgages and ***has a similar credit risk profile to our current loan book***.
>
> * * *
>
> ***Capital ratios remain robust. [CET1] as a percentage of risk weighted assets is 13.6%. Risk weighted assets at 31 March 2018 were £6,524m.***

[Emphasis added and in original.]

71. On July 24, 2018, Metro Bank issued its "H1 Trading Update 2018," wherein the Company stated, in relevant part:

> ***Capital ratios remain robust. [CET1] as a percentage of risk weighted assets is 12.7%,*** currently exceeding our Tier 1 regulatory minimum of 9.7%[.]

[Emphasis added and in original.]

72. The Company held a conference call on July 25, 2018, to discuss the "H1 Trading Update 2018." On the call, Defendant Donaldson acknowledged his and the Company's focus on and awareness of RWAs, stating, "we have definitely

driven up our loan to deposits ratio which has definitely driven up our risk weighted assets."

73. On October 24, 2018, Metro Bank issued its "Q3 Trading Update 2018," wherein the Company stated, in relevant part:

> ***Capital ratios remain robust. [CET1] of £1,164m as at 30 September 2018 is 15.7% as a percentage of risk weighted assets***, currently exceeding our Tier 1 regulatory minimum of 9.7%[.] This was supported by the completion of a £303m equity raise in July. Risk weighted assets at 30 September 2018 were £7,398m.

[Emphasis added and in original.]

74. The statements referenced in ¶¶48-73 above were materially false and/or misleading because they misrepresented and failed to disclose that: (i) Metro Bank misclassified the risk terms of many of its loans; (ii) Metro Bank's RWA and CET1 figures were false and/or misleading; (iii) Metro Bank's capital position was far less robust than represented; and (iv) Metro Bank was not in compliance with applicable banking regulations.

**<u>The Truth Leaks Out</u>**

75. On January 23, 2019, Metro Bank revealed that it misclassified the risk of hundreds of millions of pounds of loans. Metro Bank issued a press release entitled "Metro Bank Announces FY 2018 Results Preview And Trading Update," which stated, in relevant part:

> ***Recent trading***
>
> Trading in the fourth quarter continued the trends witnessed in the first three quarters led by over 100,000 new customer accounts joining the bank. During the fourth quarter we opened stores in Bath, Crawley, Northampton, Putney, Ashford, and Piccadilly and neared completion of Moorgate, which opened in early January. Metro Bank now has 66 stores ranging from Canterbury in the East to Bristol in the West of England with a further seven stores in advanced planning stages or under construction.
>
> Deposits reached £15.7bn as at 31 December 2018, an increase of 34% vs 2017, following quarterly growth of £848m. Deposit growth per store per month for 2018 was £5.9m (2017 £6.3m). Customer loans totaled £14.2bn, an increase of 48% vs 2017, following quarterly growth of £1.1bn. Total assets were £21.7bn, an increase of 32% vs 2017. ***Risk weighted assets at full year are expected to be approximately £8.9bn with the increase driven by both net loan growth and an adjustment in the risk weighting of certain commercial loans secured on property and certain specialist BTL loans to large portfolio landlords***. Total capital ratio is expected to be approximately 15.8% as at December 31 2018.

[Emphasis added and in original.]

76. The Company held a conference call on January 23, 2019, to discuss the "Full Year 2018 Results Preview and Trading Update." On the call, Defendant Arden stated that "the one-off adjustments [would] be around £900 million."

77. Also on the January 23, 2019, call, Defendant Arden admitted that the Company should "change [its] regulatory interpretation" regarding RWAs, and specifically:

> [F]or exposures secured on commercial property we're moving our risk weight from 50% to 100%. On elements of our professional buy-to-let portfolio, we're moving from 35% risk weight on certain assets up to 100%. And, where appropriate, bringing that down to 76% when supported by the SME supporting factor.

78. Multiple media reports reported and elaborated on the Company's disclosures on January 23, 2019, including *The Guardian* with its publication of an article entitled "Metro Bank shares crash after loans blunder revealed," which stated, in relevant part:

> Metro Bank has revealed a major blunder in how it classifies its loan book, an admission that drove its share price down by nearly 40% on Wednesday, wiping £800m off the value of the company.
>
> ***The bank, which has been opening new branches as established rivals cut back, revealed that hundreds of millions of pounds of commercial property loans and loans to commercial buy-to-let operators had been***

***wrongly classified in risk terms, and should have been among its "risk-weighted assets" (RWAs).***

After the blunder emerged, Metro's shares plummeted 39% from £22 to close at £13.45 as analysts feared the bank might have to raise fresh capital, just six months after tapping shareholders for £300m to finance its rapid expansion plans. When a bank has higher risk-weighted assets, regulators require higher amounts of capital to be set aside.

Metro [Bank] launched in 2010 and has opened new banking halls in city centres across the south of England. It floated on the stock market in March 2016 at £20 a share, which rose to more than £40 a share in March last year, but has since been falling.

Metro Bank chief executive Craig Donaldson said "credit quality has remained robust" and that "notwithstanding the RWAs, the bank continues to do well".

The [C]ompany said it had called in a "big four" accountancy firm to audit the loan classification, and had immediately reported the issue to the Prudential Regulatory Authority, one of the successors to the Financial Services Authority.

***When Metro Bank reassessed its loan portfolios, it found that around a 10th of its £14.5bn loan book had been given incorrect risk weightings.***

> ***It found that many of the commercial property loans had been assigned a 50% risk weighting when they should have been 100%. The situation was worse in the commercial buy-to-let book, where many loans had been given a 35% risk weighting when they should have been 100%.***
>
> The bank also revealed that tougher trading conditions meant underlying profits for 2018 were £50m, significantly below expectations of £59m but 136% up on a year earlier.
>
> Mortgage margins have been hit by harsher competition in the sector and general uncertainty in the property market over Brexit, it said.

[Emphasis added.]

79. Also on January 23, 2019, *Bloomberg* published an article entitled "Metro Bank Plunges on Misclassified Assets, Capital Concern," which stated, in relevant part:

> Metro Bank Plc fell the most since going public after applying an incorrectly low risk weighting to parts of its loan book, with the British lender's chief saying he doesn't know how long the mortgages in question had been wrongly classified.
>
> The shares plunged as much as 39 percent Wednesday and the bank's bonds also fell on concern it will need to raise more capital as a result.
>
> Metro Bank, founded to challenge Britain's big lenders almost a decade

ago by U.S. entrepreneur Vernon Hill, also said profit "softened as the last quarter progressed."

***"It was a misinterpretation of the rules," and the misclassification dates back through 2018 at least, Craig Donaldson, Metro Bank's chief executive officer, said by phone.*** "We are putting it right," he said, calling it an "isolated incident" that didn't affect the bank's earnings.

He said the bank has been in communication with Britain's Prudential Regulation Authority.

* * *

The bank previously put a 50 percent risk weighting on its commercial mortgages, but said it has now increased this to the correct level of 100 percent, a spokesperson for the lender said. For buy-to-let mortgages, the portfolio had been held at a risk weighting of 35 percent, but this has also been increased to 100 percent.

[Emphasis added.]

80. The *Financial Times* also reported the news on January 23, 2019, in an article entitled "Metro Bank reveals riskier commercial loan portfolio," which stated, in relevant part:

***Metro Bank has disclosed that it failed to have enough capital backing some commercial loans because of an accounting error***,

> sending shares in the upstart challenger to Britain's big high street lenders to their worst one-day loss.
>
> * * *
>
> ***The lender's risk-weighted assets jumped to £8.9bn — up from £7.4bn at the end of September and about £900m higher than analyst estimates — a change that revealed the bank was more exposed to riskier loans, including commercial mortgages.***
>
> The increase was driven partly by planned loan growth, but was also ***inflated by an adjustment in the weighting for riskiness given to some of its commercial property and other specialist loans***.
>
> Metro [Bank] said it had not seen any deterioration in the performance of the loans, but discovered ***they had previously been included in the wrong risk band, meaning it did not have as much capital to fund them as it should have***.

[Emphasis added.]

81. The same *Financial Times* article also brought to light the fact that analysts had raised the issue long before the Company disclosed it, stating in relevant part:

> ***The bank said it found the error during an end-of-year review, but some analysts had previously warned about its risk weightings. Christopher Cant, analyst at Autonomous, noted that its credit risk***

> ***density was unusually low compared to peers such as CYBG as early as September 2017.***

[Emphasis added.]

82. On this news, the price of Metro Bank securities plummeted $10.00, or nearly 35%, to close at $18.80 on January 23, 2019, damaging investors.

83. Despite the disclosure of the misclassification, Metro Bank continued to mislead investors on January 23, 2019. In the Company's conference call held to discuss the "Full Year 2018 Results Preview and Trading Update," in response to questions, Defendant Arden stated "***we identified the need for making the adjustment following an internal review in preparation for our year-end***[,]" and Defendant Donaldson similarly misrepresented that it was "***something we found*** as we went through our end-of-year reviews[.]" [Emphasis added.]

84. In a statement on January 31, 2019, Metro Bank admitted that bank regulators had flagged the issue before the Company had announced it, stating that "[o]ngoing supervision by the PRA helped to identify potential inconsistencies in certain loans which were raised with the bank."

85. On January 31, 2019, the *Financial Times* published an article entitled "Metro Bank bosses under fire over accounting error," which reported that the realization of the accounting errors was not based on Metro Bank's own self reporting, as the Company previously framed it, but rather in response to the PRA's concerns with Metro Bank's loans. The article stated, in relevant part:

Metro Bank faced growing pressure over its handling of an accounting mistake on Thursday, with investors, industry figures and regulatory experts suggesting senior executives would be forced to resign amid fears they may have misled the market.

The bank last week revealed it had misclassified large numbers of commercial loans when calculating risk-weighted assets, meaning it did not have as much capital against them as it should have.

Chief executive Craig Donaldson repeatedly said at the time that the mistakes were "something we found as we went through our end-of-year reviews". ***But on Thursday the bank admitted the potential problems had been pointed out by regulators at the [BoE].***

***The BoE's Prudential Regulation Authority, which supervises large banks and insurers, informed Metro [Bank] of suspected issues in some parts of its loan book, prompting a wider internal review that discovered the full extent of the mistakes. Analysts first raised concerns about the issue more than 18 months ago.***

* * *

A former BoE official said: "You would expect the PRA to be pretty annoyed. The firm has put them in a position where the PRA has come in for criticism when actually they were the ones to point out the error . . . in terms of follow-on enforcement action, the question is when do

> you pull the trigger. Supervisors will always want to remediate the problem before they refer the matter to enforcement."

[Emphasis added.]

86. The *Guardian* also reported on the Company's January 31, 2019, admission in an article entitled "Metro Bank chief has talked himself into hole over loans blunder," which stated:

> Getting these things right is meant to be basic stuff for a bank. . . . There was an obvious question: how was the mistake uncovered?
>
> * * *
>
> After the Daily Mail reported that the problem was initially spotted by the PRA, Metro had to come clean. ***"Ongoing supervision by the PRA helped to identify potential inconsistencies in certain loans which were raised with the bank," said Thursday's statement.***

[Emphasis added.]

87. On this news, the price of Metro Bank securities fell $1.70, or over 10%, to close at $14.80 on January 31, 2019, damaging investors.

88. On February 26, 2019, Metro Bank published its "Full year results and Q4 Trading Update 2018," including a "Results Presentation." The presentation described "Management Actions" taken by the Company's management with regard to the RWA adjustment, stating, in relevant part:

- Completed a review of classification and risk-weighting across the commercial loan portfolio
- Supported by a "big four" accountancy firm to review the way in which the loan book is classified
- Implementing changes to our internal procedures:
  - External assurance firm will conduct a regular review of our risk-weightings going forward
  - Recruitment of additional expertise
- Received initial notification that the PRA and FCA intend to investigate the circumstances and events that led to the RWA adjustment

89. Also on February 26, 2019, during Metro Bank's conference call held to discuss "FY Results 2018," Defendant Arden specifically disclosed that Metro Bank had "received notification from both the PRA and the FCA that they intend to investigate the circumstances and the events that led to the RWA adjustment and Metro Bank will cooperate fully in that investigation."

90. On February 27, 2019, the *Financial Times* published an article entitled "Regulators probe Metro Bank's possible false market creation," detailing that ***both*** the PRA and FCA had initiated investigations into Metro Bank. The article stated, in relevant part:

The regulators probing Metro Bank are focused on ***how employees miscalculated assets and then potentially created a false market in its shares by providing inaccurate statements to investors***, according to people familiar with the matter.

* * *

Asked about the regulatory investigations on Wednesday, Metro chief executive Craig Donaldson said he did not know anything about their scope, and some experts were surprised that the two sister regulators had both taken an interest in Metro [Bank]'s problems.

However, according to people familiar with the situation, ***the PRA is focusing on the bank's fundamental accounting error, and how it could miscalculate its risk-weighted assets despite using a so-called standardised model that is supposed to be relatively simple.***

Metro [Bank] had previously hoped to move to a new more tailored model that would cut its capital requirements in 2019, but has now said it does not expect to win approval before the end of next year.

***The FCA, meanwhile is focused on the bank's duties as a listed company to put out accurate statements***, according to people familiar with the matter. ***The episode calls this into question in a number of ways: the first hangs on whether a false market in the bank's shares***

> ***was created if earlier statements put out an overly optimistic picture of the bank's balance-sheet health before the error was detected. There is also the issue that the bank erroneously gave the impression that the RWA miscalculation had been spotted during its own review, rather than one ordered by the PRA.***
>
> The bank risks separate fines from the PRA and FCA over the incident, and its senior managers could be fined or banned for failings on their watch if wrongdoing is found.
>
> The PRA's supervisors — rather than its enforcement team — also have discretion to increase the bank's bespoke capital levels under so-called Pillar 2 requirements if it feels the bank takes undue risks.

[Emphasis added.]

91. The *Financial Times* published an additional article on February 27, 2019, entitled "Metro Bank shares dive on fund-raising, regulatory probe," which reported that the Company's share price was falling "sharply" after it announced a share placement and that it had reshuffled its Board, including the Chair of the Audit Committee:

> ***The pressure created by the capital shortfall***, together with broader challenges in the UK banking market, also ***prompted the group to revise its long-term growth forecasts***.

> Metro [Bank] said it would now aim to increase deposits by 20 per cent a year, compared with last year's growth of 34 per cent. It will also cut the pace of its branch-opening programme, and rebalance its lending priorities to focus on residential mortgages and lending to small- and medium-sized businesses.

[Emphasis added.]

92. A *Forbes* article also published on February 27, 2019, entitled "Investors Signal Strong Displeasure With Metro Bank's Asset Misclassification," reported that "[t]he fact that regulators, and not the banks' risk managers or auditors discovered the error, calls into question Metro Bank's risk management policies and procedures."

93. On this news, the price of Metro Bank securities fell $3.92, or over 22%, to close at $13.25 on February 27, 2019, damaging investors.

94. On April 23, 2019, Metro Bank published its "Annual Report and Accounts 2018" (the "2018 Annual Report"). The 2018 Annual Report included a "Chairman's statement" by Defendant Hill, "Chief Executive Officer's statement" by Defendant Donaldson, "Corporate governance overview" by Defendant Arden, and "Risk report" featuring Defendant Gillan. The 2018 Annual Report included a description of the Company's risk management policies, stating, in relevant part:

**Risk management policies**

We've established our risk management policies to identify and analyse the risks we face, to set appropriate risk limits and controls, and to monitor risks and adherence to limits. The Risk team regularly reviews these policies and controls to verify compliance and to reflect changes in market conditions and our activities. We use training and management standards and procedures to develop a robust and effective control environment – one where all colleagues understand their roles and obligations.

95. On May 1, 2019, Metro Bank held a presentation for "Q1 Results 2019," during which Defendant Donaldson stated, in relevant part:

As we discussed at the full year results in February, 2019 is a year of transition for Metro Bank. And our Q1 results demonstrate the continued momentum of the franchise and the progress in implementing our evolving strategy. ***But Q1 also reflects the challenges from the broader operating environment, as well as some adverse sentiment which we have seen following our trading update from January.***

To go into the specifics, whilst we can report the 19% year on year increase in deposits, ***we have to raise that Q1 saw a 3.6% reduction in our deposits, the result of a small number of commercial and***

> ***partnership customers reducing deposit balances with us***. However, the momentum in the core retail franchise, and SME customer base has continued with retail deposits actually up £118 million in the quarter. Although we saw some outflows, total deposits actually stabilised in March and we continue to see net growth into April. And whilst we remain committed to our medium term guidance of 20% per annum, ***given the challenge in the first quarter, we expect a more modest rate of deposit growth in 2019 as we catch up what has happened to date.***

[Emphasis added.]

96. It was also announced that the Company's profits were cut in half and a number of large customers ended their relationship with Metro Bank due to the previous misclassification of the loans. Multiple media reports revealed this disclosure, including the *Financial Times*, which, in an article entitled "Big customers desert Metro Bank over accounting error," stated, in relevant part:

> ***Some of Metro Bank's largest customers left the bank after the discovery of a historic accounting error in the first quarter, damaging growth*** at the under-fire British lender.
>
> Chief executive Craig Donaldson said ***"adverse sentiment" had led to the departure of a "small number of large commercial and partnership customers", contributing to a 4 per cent quarter-on-quarter reduction in deposits***.

> Metro Bank in January revealed that it had miscategorised a large number of commercial loans, meaning it did not have as much capital against them as it should. The discovery prompted a sharp drop in its stock — it is down 54 per cent since the start of the year — and forced the lender to cut its long-term growth plans.
>
> It is also ***working on a new share issue to prop up its capital levels***, but the bank gave no major update on the hotly-anticipated capital raise alongside its quarterly results, which were reported after markets closed on Wednesday. It noted only that the raise was "anticipated" to be completed in the second quarter.

[Emphasis added.]

97. On this news, the price of Metro Bank securities plummeted $1.95, or over 18%, over the next two trading days to close at $8.50 on May 3, 2019, damaging investors.

98. On May 16, 2019, Metro Bank announced a £350 million capital raise through the issue of new shares in the Company to be launched immediately.

99. On this news, the price of Metro Bank securities fell over 11%, from a close price of $7.60 on May 15, 2019, to a close price of $6.75 on May 16.

100. On May 17, 2019, Metro Bank raised gross proceeds of roughly £375 million from the share placement.

101. On May 17, 2019, the *Financial Times* published an article entitled "Metro Bank hopes to exit 'perfect storm' with capital push." In addition to reporting on the recent capital raise, the article again reported that "Metro was aware of concerns several months before [its] regulator forced it into action," stating, in relevant part:

> When analysts first started raising concerns about the way Metro Bank calculated the riskiness of its commercial loans, it was a £2.7bn company growing its loan book by 66 per cent a year. By the time it announced it would shore up its balance sheet with £375m in new shares on Thursday evening, the bank was worth a little over £500m, with expansion plans effectively on hold until the equity raising was completed.
>
> * * *
>
> ***[T]he bank will still have to answer questions over the sustainability of its business model and how it managed to ignore more than a year of warnings over how it calculated its capital.***
>
> * * *
>
> ***Christopher Cant, analyst at Autonomous, highlighted Metro's suspiciously low risk-weighted assets when he started covering the bank in September 2017, before outlining his concerns in more detail the following year.***

> ***His note last October highlighted a change in the way Metro calculated its RWAs in 2017, which did push its capital requirements slightly higher, but still not as high as they had to go after the PRA's intervention. The change suggested the bank had examined its policies and was aware of some degree of shortcoming before the problem was flagged externally.*** Metro declined to comment on the issue.
>
> Mr Cant did not speculate on the reasons for Metro's shift, but noted that "investors might reasonably question what the change in approach in 2017 implies about internal controls".
>
> Metro did not respond to the questions in Autonomous' publications. ***Other analysts said they also failed to extract convincing explanations from the bank before its January announcement.***
>
> "I had a conversation with [Metro's] investor relations [department] asking exactly this question and they gave a boilerplate answer," said one experienced banking analyst at another firm.

[Emphasis added.]

102. On July 24, 2019, the Company released its "H1 Trading Update 2019" and revealed even greater deposit losses, including net outflows of £2.0 billion. In addition, customer account growth of 190,000 slowed compared to 201,000 in H1 2018.

103. The H1 Trading Update 2019 also revealed that the Company's profits dropped nearly 84% in the first half of 2019:

> **Statutory profit before tax of £3.4 million in H1 2019** (H1 2018: £20.8 million) also ***reflects*** investment in the bank's transformation programme and ***remediation costs as we continue to progress remediation work following the risk-weighted asset ("RWA") adjustment in January 2019.***

[Emphasis added and in original.]

104. The H1 Trading Update 2019 further announced a sale of a £521 million BTL mortgage portfolio to Cerberus, which resulted in "[a]n expected loss of £1.8 million [to] be recognised in the Q3 2019 income statement reflecting the difference between the sale price and the carrying amount on the balance sheet." The sale was a reversing of the deal made back in 2017 between the two firms in which Metro Bank bought the same portfolio from Cerberus for £596.7 million.

105. In addition, the H1 Trading Update 2019 announced that the Company would commence the search for a new, "**independent Non-Executive Chairman**."

106. The next day, the *Financial Times* (among other news outlets) reported that "customers pulled £2 [billion] of deposits from the lender in the first half."

107. On this news, the price of Metro Bank securities dropped over 21%, from a close price of $6.05 on July 24, 2019, to a close price of $4.74 on July 25.

108. On September 17, 2019, Metro Bank issued a Base Prospectus for a £300 million bond issuance, wherein the Company disclosed the following:

> ***In August 2019, Metro Bank received a further notice that the FCA was extending the scope of its investigation into the RWA Matter to include certain senior members of management and to cover the period from 1 June 2017 through Metro Bank's Q4 2018 trading update on 26 February 2019. These investigations are focusing on Metro Bank's regulatory reporting; the systems, controls and governance Metro Bank has in place to ensure compliance with its reporting and disclosure obligations; and the timing and content of announcements related to the RWA matter and the AIRB approach announced as part of Metro Bank's Q4 2018 trading update in February 2019.*** As of the date of this Base Prospectus, these investigations remain ongoing.

[Emphasis added.]

109. On September 24, 2019, Metro Bank announced that it would cancel the bond issuance.

110. The same day, a *Reuters* article entitled "Metro Bank shares plunge to new record low after debt issue axed" reported that the cancelled issuance was due to continued issues with the loan booking errors.

111. On this news, the price of Metro Bank securities dropped over 34%, from a close price of $3.50 on September 23, 2019, to a close price of $2.30 on September 24.

112. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and the other Class members have suffered significant losses and damages.

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

113. Lead Plaintiffs brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased or otherwise acquired Metro Bank securities during the Class Period and were damaged upon the revelation of the alleged corrective disclosure (the "Class"). Excluded from the Class are the Defendants named herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

114. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Metro Bank securities were actively traded OTC. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the

proposed Class. Record owners and other members of the Class may be identified from records maintained by Metro Bank or its transfer agent and/or OTC Markets Group, Inc. and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

115. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

116. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

117. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Metro Bank;

(c) whether the Individual Defendants caused Metro Bank to issue false and misleading statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether the prices of Metro Bank securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

118. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

119. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**PRESUMPTION OF RELIANCE**

120. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Metro Bank securities are traded in an efficient market;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company's securities traded OTC in the United States;

(f) the Company was covered by multiple analysts;

(g) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h) Lead Plaintiffs and members of the Class purchased, acquired, and/or sold Metro Bank securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed without knowledge of the omitted or misrepresented facts.

121. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

122. Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of §10(b) of The Exchange Act and Rule 10b-5 (Against All Defendants)

123. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

124. This Count is asserted against Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").

125. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Metro Bank securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Metro Bank securities at artificially inflated prices. In furtherance

of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

126. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases, and other statements and documents, as described above, including statements made to securities analysts and the media, that were designed to influence the market for Metro Bank securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Metro Bank's finances.

127. By virtue of their positions at Metro Bank, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted, as described above.

128. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Metro Bank securities from their personal portfolios.

129. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Metro Bank, the Individual Defendants had knowledge of the details of Metro Bank's internal affairs.

130. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly, control the content of the statements of Metro Bank. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Metro Bank's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Metro Bank securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Metro Bank's business and financial condition, which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Metro Bank securities at artificially inflated prices and relied upon the price of the securities, the integrity

of the market for the securities, and/or statements disseminated by Defendants and were damaged thereby.

131. During the Class Period, Metro Bank securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Metro Bank securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Metro Bank securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of Metro Bank securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

132. By reason of the conduct alleged herein, Defendants have knowingly or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

133. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with

their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of §20(a) of The Exchange Act (Against All Defendants)

134. Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135. During the Class Period, the Individual Defendants participated in the operation and management of Metro Bank and conducted and participated, directly and indirectly, in the conduct of Metro Bank's business affairs. Because of their senior positions, they knew the adverse non-public information about Metro Bank's current financial position and future business prospects.

136. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, with respect to Metro Bank's business practices, and promptly correct any public statements issued by Metro Bank that had become materially false or misleading.

137. Because of their positions of control and authority as senior directors or officers and executive team members, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Metro Bank disseminated in the marketplace during the Class Period concerning the

Company's business, operational, and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Metro Bank to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Metro Bank within the meaning of §20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the market price of Metro Bank securities.

138. Each of the Individual Defendants, therefore, acted as a controlling person of Metro Bank. By reason of their senior management positions and/or being directors of Metro Bank, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Metro Bank to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Metro Bank and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

139. By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Metro Bank.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Lead Plaintiffs as Class Representatives;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiffs and the other members of the Class pre- and post-judgment interest, as well as reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

DATED: January 10, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ John T. Jasnoch
JOHN T. JASNOCH (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Thomas L. Laughlin, IV (*pro hac vice* pending)
tlaughlin@scott-scott.com
Rhiana L. Swartz (*pro hac vice* pending)
rswartz@scott-scott.com
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

Telephone: (212) 223-6444
Facsimile: (212) 223-6334

*Counsel for Lead Plaintiffs Angelo Lavdas and Stella Lavdas and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
BRIAN SCHALL (CA 290685)
brian@schallfirm.com
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192

*Additional Counsel for Lead Plaintiffs*