**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
JOHN T. JASNOCH (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508

*Counsel for Lead Plaintiffs Angelo and Stella Lavdas*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH AMANN, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> METRO BANK PLC, VERNON W. HILL, II, CRAIG DONALDSON, MIKE BRIERLEY, DAVID ARDEN, AND AILEEN GILLAN, <br><br> Defendants. | Case No. 2:19-cv-04739-TJH-JC <br><br> Assigned to: Hon. Terry J. Hatter, Jr. <br><br> **LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** <br><br> Date: <br> Time:  UNDER SUBMISSION <br> Dept.:  9B |

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT.......................................................................1

II.   BACKGROUND............................................................................................3

      A.    Banking Regulations Required Metro Bank to Maintain
            Adequate Capital Ratios ....................................................................3

      B.    Throughout the Class Period, Defendants Made False
            Statements Related to Risk Weighted Assets, Capital Ratios,
            and Regulatory Compliance................................................................4

      C.    The Truth Is Revealed and Metro Bank Admits It Was Not in
            Compliance with Banking Regulations ...............................................5

III.  ARGUMENT .................................................................................................5

      A.    Plaintiffs' Purchases Are Domestic Transactions Subject to the
            Exchange Act .....................................................................................5

      B.    This Court Has Jurisdiction to Address Defendants' Violations
            of the Exchange Act, Which Defrauded U.S. Investors Who
            Engaged in Domestic Transactions in Metro Bank Stock ...................9

            1.    The Court Has Broad Jurisdiction Under the Exchange
                  Act...........................................................................................9

            2.    The Court Has Specific Jurisdiction Over Defendants ........... 10

      C.    Plaintiffs Adequately Allege a Claim Under §10(b) ........................ 13

            1.    Plaintiffs Adequately Allege Misstatements and
                  Omissions ............................................................................. 14

            2.    Plaintiffs Allege the "In Connection With" Element of a
                  §10(b) Claim......................................................................... 19

            3.    Plaintiffs' Allegations Raise a Strong Inference of
                  Scienter ................................................................................. 21

      D.    Plaintiffs Adequately Allege a Claim Under §20(a)......................... 24

      E.    Defendants' Remaining Arguments Also Fail................................... 25

IV.   CONCLUSION ............................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist v. Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 ......................................................................................... 8, 10, 11, 12

*Adams v. Kinder Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ..................................................................... 22

*Ambassador Hotel Co. Ltd. v. Wei-Chuan Inv.*,
189 F.3d 1017 (9th Cir. 1999) ....................................................................... 19

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
2 F. Supp. 3d 550 (S.D.N.Y. 2014) ................................................................. 8

*Banco Safra, S.A. – Cayman Is. Branch v. Samarco Mineracano S.A.*,
No. 16 Civ. 8800, 2019 WL 2514056 (S.D.N.Y. June 18, 2019) ...................... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 14

*Brody v. Transitional Hosp. Corp.*,
280 F.3d 997 (9th Cir. 2002) ........................................................................ 17

*Burger King Corp. v. Rudzewicz*,
471 U.S. (1985) ............................................................................................. 12

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011) ....................................................................... 25

*Colo. River Water Conservation Dist. v. U.S.*,
424 U.S. 800 (1976) ...................................................................................... 25

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010) ............................................................ 18

*Deora v. NantHealth, Inc.*,
CV 170-1825 TJH, 2018 WL 4743494 (C.D. Cal. Mar. 27, 2018) ............. 14, 17

*ESG Capital Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016)................................................................... 14, 21

ii

*Fleming v. Charles Schwab Corp.*,
878 F.3d 1146 (9th Cir. 2017).................................................................................. 19

*Giunta v. Dingman*,
893 F.3d 73 (2d Cir. 2018) .......................................................................................... 8

*Hammer v. Frontier Fin. Corp.*,
No. C10-0643, 2011 WL 13229260 (W.D. Wash. Sept. 7, 2011) ...................... 16

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
328 F.3d 1122 (9th Cir. 2003)............................................................................... 9, 13

*Howard v. Everex Sys. Inc.*,
228 F.3d 1057 (9th Cir. 2000).................................................................................. 25

*In re Acadia Pharms. Inc. Sec. Litig.*,
No. 18-CV-01647-AJB-BGS, 2020 WL 2838686 (S.D. Cal.
June 1, 2020)...................................................................................................... 18, 23

*In re Am. Int'l Grp.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ..................................................................... 18

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008)................................................................... 25

*In re Bear Stearns Cos., Inc., Sec., Deriv. & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)............................................................... 17, 18

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)..................................................................... 16

*In re CINAR Corp. Sec. Litig.*,
186 F. Supp. 2d 279 (E.D.N.Y. 2002)..................................................................... 11

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
11-ML-2265 MRP (MANx), 2014 WL 12324284 (C.D. Cal.
Dec. 9, 2014) ............................................................................................................ 15

*In re Facebook, Inc. Sec. Litig.*,
405 F. Supp. 3d 809 (N.D. Cal. 2019) .................................................................... 17

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012)..................................................................... 16

iii

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................ 24

*In re LDK Solar Sec. Litig.*,
No. C0705182WHA, 2008 WL 4369987 (N.D. Cal. Sept. 24,
2008) ............................................................................................................ 9, 10, 11, 13

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011) ................................................................ 18

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................. 24

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................ 18

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................... 16

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................. 16

*In re PMI Grp., Inc. Sec. Litig.*,
No. C08-1405 SI, 2009 WL 1916934 (N.D. Cal. July 1, 2009) ........................ 17

*In re Poseidon Concepts Sec. Litig*,
No. 13cv1213 (DLC), 2016 WL 3017395 (S.D.N.Y. May 24,
2016) ...................................................................................................................... 13

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004) ............................................................... 11, 12

*In re Satyam Comp. Servs. Ltd. Sec. Litig.*,
915 F. Supp. 2d 450 (S.D.N.Y. 2013) ................................................................. 8

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................. 17

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 Civ. 6728, 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ..................... 16

*In re Tezos Sec. Litig.*,
Case No. 17-cv-06779, 2018 WL 4293341 (N.D. Cal. Aug. 7,
2018) ...................................................................................................................... 7

iv

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ................................................................................. 14

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
MDL No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...... 12, 13

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ............................................................. 18

*J. McIntyre Mach., Ltd. v. Nicastro*,
564 U.S. 873 (2011) ............................................................................................ 11

*Kairalla v. Advanced Med. Optics, Inc.*,
No. CV 07-05563 SJO, 2008 WL 2879087 (C.D. Cal. 2008) .......................... 11

*Karinski v. Stamps.com, Inc.*,
No. CV 19-1828-MWF, 2020 WL 281716 (C.D. Cal. Jan. 17,
2020) ................................................................................................... 17, 18, 23, 24

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
927 F. Supp. 1297 (C.D. Cal. 1996) .................................................................. 22

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*,
843 F. Supp. 2d 191 (D. Mass. 2012) ................................................................ 16

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006) .............................................................................................. 19

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ............................................................................... 17

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) ................................................................................... 2, 6, 25

*MVP Asset Mgmt. (USA) LLC v. Vestbirk*,
No. 2:10-CV-02483-GEB CKD, 2013 WL 1726359 (E.D. Cal.
Mar. 22, 2013) ...................................................................................................... 8

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ........................................................................ 21, 23

*S.E.C. v. Compania Internacional Financiera S.A.*,
No. 11 Civ. 4904(DLC), 2011 WL 3251813 (S.D.N.Y. July 29,
2011) .................................................................................................................... 20

*S.E.C. v. Danhong Chen*,
    No. 18-cv-06371-LB, 2020 WL 1976494 (N.D. Cal. Apr. 24,
    2020) .................................................................................................................. 10

*S.E.C. v. Ficeto*,
    No. CV 11-1637-GHK RZx, 2013 WL 1196356 (C.D. Cal. Feb. 7,
    2013) .................................................................................................................... 9

*S.E.C. v. Mgmt. Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975) ............................................................................... 9

*S.E.C. v. Rana Res. Inc.*,
    8 F.3d 1358 (9th Cir. 1993) .............................................................................. 20

*S.E.C. v. Sabrdaran*,
    No. 14-cv-04825, 2015 WL 901352 (N.D. Cal. Mar. 2, 2015) .......................... 20

*S.E.C. v. Sharef*,
    924 F. Supp. 2d 539 (S.D.N.Y. 2013) .............................................................. 11

*S.E.C. v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013) .............................................................. 11

*S.E.C. v. Yin Nan Michael Wang*,
    No. LACV1307553JAKSSX, 2015 WL 12656906 (C.D. Cal.
    Aug. 18, 2015) .................................................................................................... 8

*Stoyas v. Toshiba Corp.*,
    424 F. Supp. 3d 821 (C.D. Cal. 2020) ......................................................*passim*

*Stoyas v. Toshiba Corp.*,
    896 F.3d 933 (9th Cir. 2018) ....................................................................*passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. (2007) ................................................................................................ 21

*U.S. Mortg., Inc. v. Saxton*,
    494 F.3d 833 (9th Cir. 2007) ............................................................................ 20

*Utesch v. Lannett Co., Inc.*,
    385 F. Supp. 3d 408 (E.D. Pa. 2019) ............................................................... 23

vi

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
    No. CV 16-02942 SJO, 2017 WL 2378369 (C.D. Cal. May 31,
    2017) ...............................................................................................11, 23

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    CV 09-CV-02487-DMG, 2013 WL 12203024 (C.D. Cal. Apr. 4,
    2013) ......................................................................................................8

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ...............................................20

**Statutes**

Federal Rules of Civil Procedure
    Rule 9(b) .............................................................................................14
    Rule 12(b)(6) ......................................................................................14

15 U.S.C.
    §78u-4(b)(1)........................................................................................14

Lead Plaintiffs Angelo and Stella Lavdas ("Plaintiffs") respectfully submit this Memorandum of Points and Authorities in opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (the "AC").[1]

## I.    PRELIMINARY STATEMENT

This securities class action alleges violations of §§10(b) and 20(a) of the U.S. Securities & Exchange Act of 1934 ("Exchange Act") arising from the purchase of Metro Bank plc ("Metro Bank" or the "Company") stock sold on the U.S. OTC market under the ticker symbol "MBNKF."

Metro Bank is a bank based in the United Kingdom ("U.K.") whose stock trades in the U.S. OTC market. Plaintiffs allege that during the Class Period, Metro Bank and its top officers engaged in a massive and egregious fraud. Specifically, in what has been described as a "***fundamental accounting***" misstatement, Defendants misclassified approximately ***$1.1 billion*** of its loans in risk categories that were lower than required by banking regulations. In other words, Metro Bank's loan portfolio was significantly riskier than it stated and the Company needed far more capital to cover the risk of loss. As the truth became known, the stock price of Metro Bank plummeted 90%. Accordingly, the statements made throughout the Class Period, assuring investors of Metro Bank's robust capital ratios and compliance with banking regulations, were materially false and misleading.

Similarly, it is obvious that Plaintiffs have pled enough to support a pleading stage inference of scienter. The magnitude of the misstatement – sufficient to render the Company's stock nearly worthless – and the fact that the misstatement

---

[1]    Unless otherwise defined herein, all capitalized terms shall maintain the same meaning as those defined in the AC, filed Jan. 10, 2020 [ECF No. 45]. All "¶" and "¶¶" references are to the AC. Defendants' motion to dismiss, filed Mar. 10, 2020 [ECF No. 52-1] (the "Motion") is referred to herein as "Br." Unless otherwise indicated, internal citations and quotations are omitted and emphasis is added.

1

pertained to the Company's core operations strongly supports an inference of scienter. Moreover, news articles have since reported that Defendants were alerted to the issues with their loan classifications and risk by at least September 2017 – *18 months prior* to their admission. Furthermore, the Company's senior officers are under investigation by authorities in the U.K. regarding whether the Company had "*put out accurate statements*" and the Company's own explanation regarding the problem has been shown to be false.

In the face of clearly defined fraud, Defendants argue that the U.S. securities laws do not apply at all because Metro Bank is based in the U.K. But on this point, they are clearly wrong and contrary to directly on–point Ninth Circuit authority. In *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010), the Supreme Court made clear that U.S. securities laws apply to misstatements by a foreign issuer if the purchases and/or sale of the security qualify as "domestic transactions." *Id.* at 267. In *Stoyas v. Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018) ("*Toshiba I*"), the Ninth Circuit held that purchases and sales of the securities of Toshiba Corp., a Japanese company, on the U.S. OTC market "almost certainly" constituted domestic transactions protected by U.S. securities laws. *Id.* at 949. Under *Toshiba I*, the securities laws apply here, where Lead Plaintiffs are New Jersey residents who bought Metro Bank stock in the U.S. OTC market and are protected by U.S law.

Defendants claim there is no personal jurisdiction, but that argument fails because Defendants made misstatements subject to the U.S. securities laws that affected domestic transactions in Metro Bank securities in the U.S. OTC market.

Finally, Defendants' arguments to the sufficiency of Plaintiffs' pleadings lack merit.

Accordingly, the Court should deny Defendants' Motion in its entirety.

2

## II.   BACKGROUND

### A.   Banking Regulations Required Metro Bank to Maintain Adequate Capital Ratios

Metro Bank is a retail and commercial bank based in the U.K. whose securities trade OTC in the United States under the ticker symbol "MBNKF." ¶2. One of Metro Bank's main businesses is making loans. ¶33. In 2018, Metro Bank had £4.4 billion in commercial loans its portfolio. *Id.* The quality of Metro Bank's loans and the Company's capital levels relative to its level of risk are essential metrics of the Company's financial health relied on by investors, regulators, and bank customers. ¶35.

Banking regulators have established rules to ensure banks hold enough capital against their outstanding loans. ¶36. Specifically, the Basel II and III (collectively, "Basel") banking regulations, an internationally agreed set of measures developed after the 2007-2009 financial crisis, required Metro Bank to properly rate the riskiness of its loans using "risk weights" and maintain capital levels sufficient to cover that risk. ¶¶5, 38. Basel provides specific instructions on how to calculate "risk weights" using a standardized approach, which is reported to be relatively simple. ¶¶41-42, 90.

A bank's capital ratio is the percentage of the bank's capital to its risk-weighted assets or "RWAs." ¶40. Weights are defined by risk-sensitivity ratios, the calculation of which is dictated under Basel. *Id.* Basel's capital-to-RWAs ratio promotes financial stability and efficiency in economic systems throughout the world. *Id.* Risk-weights impact a number of important metrics that banks, particularly Metro Bank, regularly report to investors and the public, including RWAs and the CET1 ratio. ¶43. RWAs are used to determine the minimum amount of capital that a bank or financial institution must hold. *Id.* The higher the RWAs, the more capital regulators require a bank or financial institution to set aside. *Id.* The CET1 ratio is a bank's most secure capital divided by its RWAs

3

and expressed as a percentage, the higher the RWAs, the lower the CET1 ratio will be. *Id.*

### B. Throughout the Class Period, Defendants Made False Statements Related to Risk Weighted Assets, Capital Ratios, and Regulatory Compliance

Throughout the Class Period, Metro Bank repeatedly made false and misleading statements about its RWAs, capital ratios, and regulatory compliance that were grossly inaccurate in light of the fact that the Company had wrongly classified $1.1 billion in loans into risk categories that were lower than those required by bank regulations. For example, in each year, the Company actually stated the purported total of its risk weighted assets: for 2016, it claimed to have £3.6 billion in RWAs (¶55); and for 2017, it claimed to have £5.9 billion (¶67). These statements were false and misleading because, as it later admitted, the Company had approximately £900 million, or $1.1 billion, in additional RWAs that were not appropriately graded as such. ¶¶76-77, 80.

Defendants repeatedly stated that it had "robust" capital in proportion to its RWAs and reported specific ratios for specific years. ¶¶48-49, 51-52, 57, 59, 61-62, 64, 70-71, 73. These statements were false because the Company had far more RWAs than admitted, so the ratios were incorrect and worse. ¶80. Further, it was misleading to claim that capital ratios were robust when the financial condition of the bank was far more precarious.

Defendants also misrepresented that the Company had strong risk management and was complaint with the law. ¶¶54, 56, 60, 65 ("we manage our capital ratios conservatively"; and "[o]ur internal requirements are super equivalent to what the regulator asks us to hold."); ¶¶66, 69. These statements were false as well. The Company was rampantly violating banking regulations and its risk management system was broken, as evidenced by the fact that the Company was actively misclassifying huge numbers of loans. ¶¶76-80.

4

### C.   The Truth Is Revealed and Metro Bank Admits It Was Not in Compliance with Banking Regulations

Unbeknownst to investors, Metro Bank was not in compliance with banking regulations and did not have adequate capital ratios.  Instead, in what has been described as a "fundamental accounting error," Metro Bank admitted it had misclassified a large number of loans as being less risky than they actually were and that it, in fact, held approximately *$1.1 billion* more in RWAs than it had previously stated.  ¶¶6, 75.

And while analysts and U.K. regulators had alerted Defendants to the risk that the Company was misclassifying loans on or about the middle of 2017, Defendants did not admit to the "miscalculation" of RWAs until approximately *18 months later*, on January 23, 2019, which resulted in a nearly 35% one-day decline in the price of Metro Bank securities.  ¶¶7-8, 81, 85.  And even then, Metro Bank claimed to have identified the issue on its own before being forced to admit eight days later, on January 31, 2019, that regulators from the Bank of England ("BoE") had raised the issue.  ¶¶8, 83-84.  On this news, the price of Metro Bank securities fell again.  ¶87.  In total, Metro Bank has dropped approximately 90% as investors and depositors learned the truth and abandoned the Company.  ¶¶10-11.

The Company and its senior management are currently under investigation by regulators in the U.K. to determine whether Defendants violated "*the bank's duties as a listed company to put out accurate statements*" and whether Defendants created a "*false market in the bank's shares*" with "*earlier statements [painting] an overly optimistic picture of the bank's balance sheet health*."  ¶¶9, 89-90.

## III.   ARGUMENT

### A.   Plaintiffs' Purchases Are Domestic Transactions Subject to the Exchange Act

Defendants make the threshold argument that the U.S. securities laws do not apply because Metro Bank is based in the U.K.  That is wrong.  The Supreme

5

Court's decision in *Morrison* holds that U.S. securities laws apply to domestic transactions in securities, and the Ninth Circuit's decision in *Toshiba I* makes clear that transactions like those here – purchases made by U.S. residents, from the U.S., on the U.S. OTC market – are protected by the U.S. securities laws. *Morrison*, 561 U.S. at 267; *Toshiba I*, 896 F.3d at 949.

In *Morrison*, the Supreme Court addressed the extraterritorial application of the Exchange Act and held that §10(b) applies to both "transactions in securities listed on domestic exchanges, and ***domestic transactions in other securities[.]***" 561 U.S. at 267.[2]  The Supreme Court further outlined a "transactional test," which analyzes "whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange." *Id.* at 269-70.  In *Toshiba I*, the Ninth Circuit adopted the "irrevocable liability" test to determine when a securities transaction is "domestic" under *Morrison*, finding that "[l]ooking to ***where purchasers incurred the liability to take and pay for securities, and where sellers incurred the liability to deliver securities*** hews to Section 10(b)'s focus on transactions and *Morrison*'s instruction that purchases and sales constitute transactions."  896 F.3d at 949.  Applying the test, the Ninth Circuit held that transactions substantially similar to those at issue here were "almost certainly" domestic transactions subject to the U.S. securities laws.  896 F.3d at 949.  With that guidance, in *Stoyas v. Toshiba Corp*., 424 F. Supp. 3d 821, 825 (C.D. Cal. 2020) ("*Toshiba II*"), this Court held that the U.S.-based plaintiffs had adequately alleged a domestic transaction in a substantially similar case involving U.S.

---

[2]      While Defendants rely heavily on *Morrison* (Br. at 10-12), the case involved foreign plaintiffs suing foreign defendants for misconduct in connection with securities traded on foreign exchanges.  561 U.S. at 268 ("all aspects of the purchases complained of . . . occurred outside the United States").  Thus, the specific holding of Morrison is inapplicable here, where Plaintiffs are U.S. residents who purchased in the U.S. OTC market while in the U.S.

6

transactions on the U.S. OTC market by U.S. investors in a foreign company. *Id.* at 825-7.

As demonstrated by *Toshiba I* and *Toshiba II*, Plaintiffs' transactions are domestic transactions protected by U.S. securities laws. Plaintiffs are U.S. residents who purchased Metro Bank stock from their home in the United States. ¶17; Joint Declaration of Lead Plaintiffs Angelo and Stella Lavdas, filed herewith (the "Declaration"), ¶3. The placement of the buy order, payment of the purchase price in U.S. currency, and other related transactions took place in the United States. ¶21; *see also* Declaration, ¶¶1-6. Further, the transactions took place using the facilities of the OTC market, all of which were and are located in New York, New York and designed to serve clients in the United States. ¶19. As the Court acknowledged in *Toshiba I*, the OTC market is also regulated by the U.S. Securities and Exchange Commission ("SEC"). 896 F.3d at 946 ("The OTC Markets Group" is "an SEC regulated and SEC-registered alternative trading system."). Furthermore, the OTC market rules: (1) bind purchasers and sellers to complete transactions when offers to purchase or sell are posted on the market, and (2) deem sales complete upon delivery of funds by the buyer and delivery of securities by the sellers – events which occurred in the United States. FINRA, Rule 5220 (2012).

The foregoing facts, the binding precedent in *Toshiba I* and *Morrison*, and the reasoning in *Toshiba II* all support a finding that Plaintiffs incurred irrevocable liability to complete the transaction in the United States. The details that Metro Bank complains are missing are irrelevant (Br. at 12), and Defendants fail to distinguish this case from the holdings in *Toshiba I* and *Toshiba II*. Indeed, the cases are legion that hold that the irrevocable liability test is satisfied where, as here, either the buyer or the seller became bound in the United States. *See, e.g.*, *Toshiba I*, 896 F.3d at 947-49; *Toshiba II*, 424 F. Supp. 3d at 825-28; *In re Tezos*

*Sec. Litig.*, Case No. 17-cv-06779, 2018 WL 4293341, at \*8 (N.D. Cal. Aug. 7, 2018) (Exchange Act applies where plaintiff participated in the transaction from the U.S.); *S.E.C. v. Yin Nan Michael Wang*, No. LACV1307553JAKSSX, 2015 WL 12656906, at \*10 (C.D. Cal. Aug. 18, 2015) (applying the irrevocable liability test to find that the Exchange Act applies to offerings made only to foreign residents because the purchases closed in the U.S.); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, CV 09-CV-02487-DMG (PLAx), 2013 WL 12203024, at \*6-7 (C.D. Cal. Apr. 4, 2013) (transaction was domestic when seller became bound in the United States).[3]  The bottom-line is that Plaintiffs purchased MBNKF on the U.S. OTC market, in U.S. dollars, while located in the U.S., and thus became bound to complete the transaction in the U.S.  These facts constitute a domestic transaction and trigger the protections of the Exchange Act.[4]

[3]      *See also Giunta v. Dingman*, 893 F.3d 73, 80-82 (2d Cir. 2018) (Exchange Act applies where trading rules bound parties to complete transaction, regardless of whether the exchange could cancel or modify transaction to rectify errors); *Absolute Activist v. Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 ("[I]t is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States."); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 560 (S.D.N.Y. 2014) (domestic transaction occurred where order was placed with broker in Miami who transmitted the order to a broker-dealer in New York, where funds from plaintiff's account were transferred).

[4]      Defendants' cited authority is unavailing.  First, Defendants cite to non-binding, Second Circuit cases with inapplicable facts.  *See, e.g.*, *Banco Safra, S.A. – Cayman Is. Branch v. Samarco Mineracano S.A.*, No. 16 Civ. 8800, 2019 WL 2514056 (S.D.N.Y. June 18, 2019) ("This is a case by a Brazilian/Cayman Island plaintiff against Brazilian defendants regarding Brazilian bonds and claims which relate to a Brazilian catastrophe. The bonds were never listed on a U.S. exchange and were principally offered and sold outside the United States."); *In re Satyam Comp. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 476 (S.D.N.Y. 2013) ("[T]he FACC, however, does not include any facts about the location of the transactions at issue").  Second, Defendants' remaining authority pre-dates *Toshiba I* and also involves a complaint with no allegations whatsoever regarding the location of the transaction.  *See MVP Asset Mgmt. (USA) LLC v. Vestbirk*, No. 2:10-CV-02483-GEB CKD, 2013 WL 1726359, at \*6-7 (E.D. Cal. Mar. 22, 2013).  As the cases Metro Bank relies upon illustrate, the "irrevocable liability" test bars application of the Exchange Act only where a transaction was foreign, rendering it implausible that either party became bound in the U.S.  No remotely similar facts are present here, where all relevant aspects of the transactions at issue were domestic.  *E.g.*, ¶¶16, 19, 21; *see also* Declaration, ¶¶1-6.  Moreover, Defendants mischaracterize

8

**B.    This Court Has Jurisdiction to Address Defendants' Violations of the Exchange Act, Which Defrauded U.S. Investors Who Engaged in Domestic Transactions in Metro Bank Stock**

**1.    The Court Has Broad Jurisdiction Under the Exchange Act**

Since the Exchange Act clearly applies to the domestic transactions here, this Court's jurisdiction follows. Indeed, the exercise of personal jurisdiction is of key importance in securities cases, such as this, because "the integrity of this nation's securities markets would be undermined if foreign corporations and executives could fleece those capital markets while standing just beyond the water's edge." *In re LDK Solar Sec. Litig*., No. C0705182WHA, 2008 WL 4369987, at *7 (N.D. Cal. Sept. 24, 2008). Accordingly, "[t]he Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause." *S.E.C. v. Ficeto*, No. CV 11-1637-GHK RZx, 2013 WL 1196356, at *4 (C.D. Cal. Feb. 7, 2013). Further, where "Congress has provided for nationwide service of process for claims under federal securities laws, . . . the question becomes whether the party has sufficient contacts with the United States, not any particular state." *LDK Solar*, 2008 WL 4369987, at *5; *see also S.E.C. v. Mgmt. Dynamics, Inc*., 515 F.2d 801, 812 (2d Cir. 1975) (§20(a) of the Exchange Act has been read liberally and its "provisions were enacted to expand, rather than restrict the scope of liability under the securities laws").

Where, like here, no evidentiary hearing has been held, plaintiffs need only establish a *prima facie* case of personal jurisdiction and are entitled to have their allegations taken as true and all factual disputes drawn in their favor. *Harris*

the Ninth Circuit's opinion in *Toshiba I*. While the Ninth Circuit adopted the irrevocable liability test, it did not decide what was required to meet the test. The Ninth Circuit did not, as Metro Bank asserts, hold that allegations about the location of the parties or the market where the transactions took place were incompetent to support an allegation that irrevocable liability was incurred here in the U.S. Br. at 12. In fact, the Ninth Circuit expressly recognized that, given the location of the parties and the OTC market, "an amended complaint could almost certainly allege sufficient facts to establish . . . a domestic transaction." *Toshiba I*, 896 F.3d at 949.

9

*Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003); *S.E.C. v. Danhong Chen*, No. 18-cv-06371-LB, 2020 WL 1976494, at *5 (N.D. Cal. Apr. 24, 2020).

### 2.     The Court Has Specific Jurisdiction Over Defendants

Specific personal jurisdiction exists if the underlying claims arise out of Defendants' forum-related contacts.[5]   In the Ninth Circuit, specific personal jurisdiction follows a three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable.

*LDK Solar*, 2008 WL 4369987, at *5.

The first prong is sometimes referred to as minimum contacts or as the purposeful availment prong.  "Because this is a securities fraud case, minimum contacts may be established either by purposeful direction or purposeful availment," *Ficeto*, 2013 WL 1196356, at *4, "or by some combination thereof." *LDK Solar*, 2008 WL 4369987, at *5.  "The fraud aspects of a securities case may establish purposeful direction, as in a tort case, while the transactional aspects of a securities case may establish purposeful availment." *Ficeto*, 2013 WL 1196356, at *4.   Here, this test is satisfied because Plaintiffs allege that Defendants intentionally made materially false and misleading statements about Metro Bank

---

[5]     Plaintiffs allege that the Court has specific jurisdiction, as opposed to general jurisdiction, over Defendants.  Defendants' arguments related to general jurisdiction (Br. at 7) are thus irrelevant.

that they knew or should have known would be relied upon by U.S investors purchasing Metro Bank stock on the U.S. OTC market. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 351-52 (D. Md. 2004) ("United States courts frequently have asserted personal jurisdiction over [foreign] individual defendants who sign or, as control persons, approve the filing or dissemination of, particular forms required by the SEC which they knew or should have known would be relied on by U.S. investors.") *S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 547 (S.D.N.Y. 2013) ("It is by now well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies [the jurisdictional] test.").

Accordingly, Plaintiffs have "carried [their] *prima facie* burden to establish that [Defendants] purposefully directed the alleged fraud at the United States." *Ficeto*, 2013 WL 1196356, at *5; *see also LDK Solar*, 2008 WL 4369987, at *6 (holding that individuals "purposefully availed themselves of the forum by taking advantage of this nation's laws and its capital markets, and in so doing purposefully directed a fraud at investors"); *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. CV 16-02942 SJO (KSx), 2017 WL 2378369, at *8 (C.D. Cal. May 31, 2017) ("A foreign corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court for fraudulently manipulating that market."); *see also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) ("in some cases . . . the defendant might well fall within the [forum's] authority by reason of his attempt to obstruct its laws").[6]

---

[6] *See also Kairalla v. Advanced Med. Optics, Inc.*, No. CV 07-05563 SJO (PLAx), 2008 WL 2879087, *15 (C.D. Cal. 2008); *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 248 (S.D.N.Y. 2013); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 306 (E.D.N.Y. 2002).

11

Second, despite Defendants' arguments to the contrary (Br. at 9), Plaintiffs' claims clearly relate to Defendants' forum-related conduct. In particular, Plaintiffs' claims arise from Defendants' dissemination of materially false and misleading statements in their financial statements, and the conference calls discussing those statements, which were directed at U.S. investors. Courts regularly assert jurisdiction in such circumstances. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 66281, at *22 (N.D. Cal. Jan. 4, 2017) ("The but for test is satisfied here as Plaintiffs have established a direct nexus between their causes of action for securities fraud and [Defendants'] contacts with the United States, i.e., the false statements they made[.]"); *Royal Ahold*, 351 F. Supp. 2d at 351-52.

Third, the exercise of specific personal jurisdiction here comports with "traditional notions of fair play and substantial justice" – that is, it is reasonable under the circumstances of this case. As explained above, there is a domestic market for Metro Bank stock governed by U.S. securities laws. Given that fact, it is reasonable to hale Defendants into a U.S. court to answer for their violations of U.S. law and the harm they caused U.S. investors in the United States.

At this stage, the burden shifts and Defendants must advance a "compelling" reason that jurisdiction is unreasonable. *See Burger King Corp. v. Rudzewicz*, 471 U.S. at 462, 477-78 (1985); *Ficeto*, 2013 WL 1196356, at *7. Defendants' arguments on this point are unavailing. To begin with, Defendants' argument that the burden to defend themselves in the United States is "significant" essentially amounts to an assertion of inconvenience. Br. at 10. However, "inconvenience is insufficient to overcome the strong presumption of reasonableness of the assertion of personal jurisdiction because this factor will always favor the non-forum defendant." *Ficeto*, 2013 WL 1196356, at *7. Moreover, Metro Bank, a major corporation that likely has insurance, can hardly claim that it is unable to shoulder

12

the burden of this litigation. In addition, Metro Bank's argument that "[t]he U.S. does not have a strong interest in adjudicating this dispute" is false. Br. at 10. The United States has "a strong interest in having American courts interpret and apply U.S. securities law." *In re Poseidon Concepts Sec. Litig*, No. 13cv1213 (DLC), 2016 WL 3017395, at \*10 (S.D.N.Y. May 24, 2016). Further, the United States has a strong interest in shielding its domestic securities markets from fraud. *LDK Solar*, 2008 WL 4369987, at \*7. Further, the records of MBNKF and the OTC market are located in the United States, the laws that were violated (the Exchange Act) are U.S. laws, and Plaintiffs reside in the United States. Pursuing this action in the U.K. would result in an extraordinary burden to these average retail investors that live within the United States. It is also not apparent that class actions are readily available in the U.K. or that U.S. purchasers of MBNKF could easily participate. Furthermore, the U.K. court would have to apply U.S. federal securities laws to the claims. These factors weigh in favor of litigation of the case in the United States.

Accordingly, Defendants have failed to meet their weighty burden that exercising jurisdiction would not otherwise comport with "fair play and substantial justice." *Volkswagen*, 2017 WL 66281, at \*19.[7]

**C. Plaintiffs Adequately Allege a Claim Under §10(b)**

To state a federal securities fraud claim, in violation of §10(b), a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

---

[7]     To the extent the Court finds the AC's jurisdictional allegations inadequate, the Court respectfully should not dismiss the claims without first affording Plaintiffs the opportunity to conduct jurisdictional discovery. *Rutsky*, 328 F.3d at 1135 (denial of jurisdictional discovery constitutes an abuse of discretion when further discovery "might well demonstrate facts sufficient to constitute a basis for jurisdiction"). Furthermore, to the extent the Court finds Plaintiffs' allegations with respect to *Morrison* insufficient, Plaintiffs' respectfully request leave to amend. As the Ninth Circuit has stated in *Toshiba I*, Plaintiffs can "almost certainly" plead that their transactions were domestic under the circumstances.

13

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1032 (9th Cir. 2016); *Deora v. NantHealth, Inc.*, CV 170-1825 TJH (MRWx), 2018 WL 4743494, at *2 (C.D. Cal. Mar. 27, 2018).  A plaintiff "need not prove its case at the outset. Rather, it has to provide a narrative of fraud – facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Capital*, 828 F.3d at 1035.

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to plaintiff." *Toshiba II*, 424 F. Supp. 3d at 825.  A complaint "does not need detailed factual allegations," but need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Toshiba I*, 896 F.3d at 939.

Defendants only contest that Plaintiffs failed to adequately allege a material misrepresentation "in connection with" the purchase or sale of security and scienter (Br. at 14) and, therefore, concede that Plaintiffs satisfy the remaining elements.

### 1.   Plaintiffs Adequately Allege Misstatements and Omissions

To plead falsity under Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (quoting 15 U.S.C. §78u-4(b)(1)).  Here, the falsity of Metro Bank's statements regarding its capital ratios, RWAs, and compliance with banking regulations is all but "undisputed." *Id.*  For years, Defendants made specific representations about the Company's RWAs and capital levels and told investors that its financial position was strong, that it had well-functioning risk management, and complied with banking rules. *See, e.g.*, ¶¶48-49, 51-52, 54-57, 59-62, 64-67, 69-71, 73.

14

None of these statements were even remotely true.  Defendants were forced to admit as much after U.K. banking regulators raised the issue in January 2019, even though analysts and regulators had alerted the Company to the risk that it was misclassifying loans as early as September 2017 – *eighteen months prior*.  ¶¶7, 81-85, 101.  Moreover, Defendants did not merely misclassify a few loans, rather, a huge number, upwards of $1.1 billion, was misclassified.  ¶76.  This amounted to approximately 10% of Metro Bank's entire loan portfolio.  ¶78.  The failing was catastrophic in nature, a "fundamental accounting error" that clearly supports an inference of falsity.  ¶90.

As reported in the *Financial Times*:

The [U.K. Financial Conduct Authority], meanwhile is focused on the bank's duties as a listed company to put out accurate statements, according to people familiar with the matter. The episode calls this into question in a number of ways: the first hangs on whether a false market in the bank's shares was created if earlier statements put out an overly optimistic picture of the bank's balance-sheet health before the error was detected. There is also the issue that the bank erroneously gave the impression that the RWA miscalculation had been spotted during its own review, rather than one ordered by the [Bank of England].

¶90.  The problem was so fundamental that the truth reduced the market value of Metro Bank stock by 90%.  ¶¶10-11.

Defendants' misstatements regarding the Company's risk assets and capital ratios are actionable.  *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 11-ML-2265 MRP (MANx), 2014 WL 12324284, at *5 (C.D. Cal. Dec. 9, 2014) ("Defendants' pledge that specific procedures were followed in generating appraisals and LTV's constitutes an actionable statement of material fact.");

15

*Hammer v. Frontier Fin. Corp.*, No. C10-0643, 2011 WL 13229260, at *9 (W.D. Wash. Sept. 7, 2011) ("statements . . . relating to . . . capital ratios, are specific enough that an investor might rely on them.  It is very difficult to believe that a consumer is 'extremely unlikely' to rely on statements like capital ratios remain strong."); *In re New Century*, 588 F. Supp. 2d 1206, 1227 (C.D. Cal. 2008) ("an understatement of the repurchase reserve and an improper valuation of residual interests that were both misrepresentations when made" were actionable); *see also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728, 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018) (allegations concerning loan loss reserves actionable); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 387 (S.D.N.Y. 2012) (statement describing loan portfolio as "high quality" actionable); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 769 (S.D.N.Y. 2012) (allegations that appraisals were not conducted in accordance with USPAP were actionable as "a statement of verifiable fact"); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 203 (D. Mass. 2012) ("A representation that certain specific standards will be used to generate appraisals is itself an actionable statement of fact.").[8]

Metro Bank's repeated intonation of its compliance with banking regulations when the Company was in violation of those regulations is actionable.  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (finding statements regarding compliance and internal controls actionable where "the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of

---

[8]    Defendants' puffery argument also fails.  *Petrobras*, 116 F. Supp. 3d at 381 (rejecting puffery argument).   While Defendants attempt to parse Plaintiffs' allegations regarding its capital ratio and focus on the term "robust," they ignore that the Company's capital ratios and RWAs were the most fundamental aspects of the Company's business.  ¶¶35-47.  It is not credible for Defendants to claim that these statements were not relied on by investors.

16

the true state of affairs at the Company"); *In re Bear Stearns Cos., Inc., Sec., Deriv. & ERISA Litig.*, 763 F. Supp. 2d 423, 458-59 (S.D.N.Y. 2011) (finding statement that a company "is in compliance with CSE regulatory capital requirements" actionable where it "repeatedly violat[ed] CSE rules"); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (holding that "plaintiffs' factual allegations, accepted as true, suggest that the Company recklessly or intentionally misled investors as to the state of its internal controls"); *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (finding compliance statements actionable where they "gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations").    Moreover, "[b]ecause Defendants touted [their compliance with banking regulations], [Defendants] had a duty to disclose adverse information that cut against this positive information." *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKx), 2020 WL 281716, at *12 (C.D. Cal. Jan. 17, 2020); *Deora*, 2018 WL 4743494, at *3 ("Once NantHealth chose to tout positive information[,] . . . it was bound to do so in a manner that would not mislead investors.").[9]

Metro Bank's statements regarding its risk management controls and compliance are also actionable. *In re PMI Grp., Inc. Sec. Litig.*, No. C08-1405 SI, 2009 WL 1916934, at *7 (N.D. Cal. July 1, 2009) (statements "assur[ing] investors that [the Company's] core strength was credit risk management, despite the fact that [the Company's] proprietary system could no longer adequately evaluate [such] risk" were actionable) (citing *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1005-06 (9th Cir. 2002) (statements actionable where they "create an

---

[9]    Defendants' citations to case law discussing "general compliance" are thus inapposite. *See, e.g.*, *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019) (finding a one-time "statement of general compliance" inactionable).

impression of a state of affairs that differs in a material way from the one that actually exists")); *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1094 (N.D. Cal. 2017) (statements regarding risk management controls actionable); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 284-85 (S.D.N.Y. 2011) (complaint "sufficiently alleges that the statements that Lehman enforc[ed] adherence to [its] risk policies and that [m]anagment's [*sic*] Finance Committee oversees compliance with [risk] policies and limits arguably were materially misleading"); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (misstatements about risk controls, including that they were "robust," actionable); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (noting disclosures stating that internal controls and risk management mitigated risk are actionable where defendants have information to the contrary); *Bear Stearns*, 763 F. Supp. 2d at 494 (same); *In re Am. Int'l Grp.*, 741 F. Supp. 2d 511, 530 (S.D.N.Y. 2010) (same).

Confronted with a clear violation of §10(b), Defendants mischaracterize Plaintiffs' allegations by attempting to classify their misstatements into three categories. Br. at 16. However, Defendants' misstatements all relate to Metro Bank's misclassification of their loans, which resulted in their statements regarding their capital ratios and compliance with applicable banking regulations being false. In fact, Defendants themselves list the same statements in more than one category. *See id.* (including ¶¶48, 51-52, 55-57, 59, 63-65, 69, 73 in multiple categories). That Defendants restated their misstatements on so many occasions, and in so many iterations, does not amount to "puzzle pleading," but instead underscores the extent of their fraud.[10]

---

[10]   *See, e.g., In re Acadia Pharms. Inc. Sec. Litig.,* No. 18-CV-01647-AJB-BGS, 2020 WL 2838686, at *4 (S.D. Cal. June 1, 2020) (not "puzzle pleading" where, as here, the "complaint contains a designated section entitled Materially False and Misleading Statements Issued During the Class Period"); *Karinski*, 2020 WL 281716, at *9 (not "puzzle pleading" where "based on the Motion, Defendants

18

## 2.   Plaintiffs Allege the "In Connection With" Element of a §10(b) Claim

The Ninth Circuit has repeatedly emphasized that the "in connection with requirement" provides only a "slim hurdle" and is satisfied by a showing that the fraud "ha[d] more than some tangential relation to the securities transaction." *Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1155 (9th Cir. 2017); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("Under our precedents, it is enough that the fraud alleged coincide with a securities transaction – whether by the plaintiff or by someone else."). In *Toshiba I*, the Ninth Circuit affirmed that "in connection with should be construed not technically and restrictively, but flexibly." 896 F.3d at 951 ("for fraud to be in connection with the purchase or sale of any security, it must touch the sale"). With this guidance, in *Toshiba II*, this Court recently found that plaintiffs had satisfied the "in connection with" requirement in a substantially similar case involving domestic transactions in securities of a foreign company. 424 F. Supp. 3d at 828.

While Defendants attempt to argue around the recent holdings in *Toshiba I* and *Toshiba II* (Br. at 14), they cannot escape the conclusion that the "in connection with" requirement is met where, as here, the alleged misrepresentations would influence a reasonable investor or affect the value or merit of the securities in question or the risks involved in purchasing them. *Toshiba II*, 424 F. Supp. 3d at 828 (allegations that defendants "concealed the true condition of Toshiba's business and the risks to its financial success and misled investors about the risks associated with the purchase or sale of securities . . . plausibly demonstrate some causal connection between Defendant's conduct and the purchase or sale of the [OTC securities] at issue"); *see also Fleming*, 878 F.3d at 1154-55; *Ambassador Hotel Co. Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999).

appear to have been able to identify the alleged misstatements and the reasons why the statements were misleading").

19

The alleged fraud here involved false and misleading trading updates and annual reports issued by Metro Bank and statements by its highest ranking officials that clearly concealed the risks of purchasing MBNKF and influenced decisions by U.S. investors on the OTC market to purchase those securities. ¶¶48-73. Metro Bank's overstatement of its capital reserves also directly affected the value of MBNKF, as demonstrated by the substantial stock price declines that occurred when Metro Bank's fraud was revealed, injuring investors who purchased those securities in the United States. ¶¶78-79, 82, 87, 93, 96-97, 99, 107, 111. Under these circumstances, binding Ninth Circuit precedent warrants the conclusion that the fraud was carried out "in connection with" the transactions in MBNKF at issue in this case. *E.g.*, *Toshiba I*, 896 F.3d at 951; *U.S. Mortg., Inc. v. Saxton*, 494 F.3d 833, 844-45 (9th Cir. 2007) (scheme to fraudulently hide defendant's financial condition by overstating its quarterly results in a manner that inflated its stock price "coincide[d]" with the purchase or sale of securities and satisfied the "in connection with" requirement); *see also S.E.C. v. Rana Res. Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993).[11]

---

[11]    The case law does not support Metro Bank's contention that the "in connection with" requirement requires that the Company had some active involvement in the issuance or sale of the securities whose price was affected by its fraud. Br. at 14. In fact, the Ninth Circuit soundly rejected this argument in *Toshiba I*. 896 F.3d at 949 ("it does not matter that a foreign entity was not engaged in the transaction"); *see also S.E.C. v. Compania Internacional Financiera S.A.*, No. 11 Civ. 4904(DLC), 2011 WL 3251813, at *6 (S.D.N.Y. July 29, 2011) ("*Morrison* . . . never states that a defendant must itself trade in securities listed on domestic exchanges or engage in other domestic transactions."). In contrast, the Exchange Act has been regularly applied against issuers based on transactions in options and other derivative securities that they were not involved in creating. *See, e.g.*, *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 965 (N.D. Cal. 2005) (fraud was in connection with equity-linked debt securities sold by UBS without involvement from the defendant corporation); *S.E.C. v. Sabrdaran*, No. 14-cv-04825, 2015 WL 901352, at *8-14 (N.D. Cal. Mar. 2, 2015) (insider trading was "in connection with" the company's securities where defendant-trader placed "spread bets" with a U.K. broker).

20

### 3.   Plaintiffs' Allegations Raise a Strong Inference of Scienter

Plaintiffs have pled that Defendants misstated core aspects of the Company's business – its RWAs, financial strength, and legal compliance – in a fundamental way for more than a year. *See supra* at 4. These misstatements were so significant in scope that when the truth was revealed, investors determined that the Company's stock was almost worthless. Plaintiffs have also pled that Defendants were warned about the issue by analysts and the government approximately 18 months prior to the first disclosure. Moreover, Plaintiffs have pled that Defendants have already been caught in a lie about how the classification issue was uncovered by the Company. In light of these allegations, it would be absurd to conclude that the AC does not support a pleading stage inference that Defendants were at least reckless in making the alleged misleading statements. Viewed in their totality, the facts support a strong inference that Defendants knowingly or recklessly allowed Metro Bank to misclassify huge numbers of its loans for years and overstate its financial position in violation of banking regulations.

For a §10(b) claim, the requisite level of scienter is recklessness. *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014). To assess scienter, a court must: (1) accept all factual allegations in the complaint as true; (2) consider all of the allegations collectively; and (3) entertain only those plausible opposing inferences that can be "rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. at 308 (2007). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. A court need only conclude that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" to uphold a complaint. *Id.* In other words, inferential ties go to the plaintiff. *See ESG*, 828 F.3d at 1033 ("if two possible inferences – one fraudulent and the other

21

nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter").

In this case, Plaintiffs have adequately pled scienter in a number of ways:

First, the magnitude of the misstatements itself demonstrates scienter because the misclassification of assets and violations of banking laws were so pervasive, long-standing, and egregious that they support a logical inference that Defendants were aware of the problems at the time they made their misstatements because one could not operate a bank at length without becoming aware of the problem. Courts recognize that the "magnitude of the alleged falsity" supports scienter because it is "reasonable to infer" that a company's top officers are aware of a significant issue or problem at the company. *Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003); *cf Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 (C.D. Cal. 1996) ("The facts that the allegedly overstated revenues constituted such a significant portion of [the company]'s total revenues . . . tend[s] to support the conclusion that the defendants acted with scienter."). Here, the undisclosed problems were as serious as they come. Defendants had concealed $1.1 billion in riskier assets that were misclassified in violation of banking regulations and misstated their capital position. *See supra* at 4. These true facts rendered the Company almost worthless and caused its own customers to abandon it. ¶¶10-11, 96.

Anyone surveying the depths of this scandal can see they support a strong inference that Defendants misled investors. Indeed, news articles covering Metro Bank observed that this scandal directly implicated Defendants' truthfulness. *See, e.g.*, ¶85 (describing suspicion that Defendants "may have misled the market"); ¶90 (describing how scandal "call[s] [] into question" whether the Company violated its "duty" to put out "accurate statements"); ¶101 ("The bank will still

LEAD PLAINTIFFS' MEMO. OF POINTS & AUTHORITIES IN OPP. TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:19-CV-04739-TJH-JC

have to answer questions over . . . how it managed to ignore more than a year of warnings over how it calculated its capital.").

Second, Plaintiffs have alleged that Defendants are under investigation by two sets of regulators in U.K. for misleading investors. ¶90 (describing two U.K. probes); ¶108 (stating that the Company's "senior members of management" were under investigation.). These government investigations further demonstrate scienter because they show that the U.K. government agrees with Plaintiffs that the egregious nature of the events at Metro Bank give rise to an inference of wrongdoing by management that demands investigation. *See Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019) (holding that "ongoing investigations" into wrongdoing at the company supported scienter).

Third, under the core operations doctrine, it can be inferred that corporate executives are aware of misrepresented or undisclosed matters involving a business's core operations. *See, e.g.*, *Reese*, 747 F.3d at 569, 575-76 (it is "reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies"); *see also Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *16 ("[f]alsity itself can be indicative of scienter when allegations as to falsity are combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information"). Here, the alleged misstatements were part of the Company's core operations. In fact, Defendants have admitted that they were focused on capital ratios because they were a key metric. *E.g.*, ¶¶22-27, 72.

Fourth, the Metro Bank officials who were in a position to know about the misclassification have abruptly resigned, which further supports scienter. *Karinski*, 2020 WL 281716, at *6; *see also Acadia*, 2020 WL 2838686, at *8. Defendant Donaldson, who was responsible for managing the Company's risk

LEAD PLAINTIFFS' MEMO. OF POINTS & AUTHORITIES IN OPP. TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:19-CV-04739-TJH-JC

profile, resigned following the scandal. ¶¶23, 85. Metro Bank also announced the departure of its founder, Defendant Vernon Hill, in October 2019.

Fifth, Plaintiffs have further strengthened the inference of scienter by alleging that Defendants were warned about the issue by analysts and the government approximately 18 months prior to the first disclosure. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (finding scienter where, as here, news sources reported on the red flags raised to management of widespread fraud). Defendants cannot claim to have been taken unaware by the problem. At least 18 months before Metro Bank came clean, analysts warned the Company about the problem. ¶85. For example, the *Financial Times* has reported that "Metro was aware of concerns several months before [its] regulator forced it into action," and describes a history of concern raised by analysts, including through direct calls to the Company's Investor Relations department. ¶101.

Finally, the fact that Defendant Arden continued to misrepresent that Metro Bank had identified the issues associated with the miscalculation of the RWAs on its own, when, in fact, the BoE had alerted the Company to the problems, further supports a finding of scienter. ¶¶8, 83-85; *see, e.g.*, *Karinski*, 2020 WL 281716, at *6 (finding scienter where "the Company continued its deception by misrepresenting the true reasons for the termination").[12]

### D. Plaintiffs Adequately Allege a Claim Under §20(a)

Since plaintiff has alleged a primary violation of §10(b), Defendants' motion to dismiss its §20(a) claim fails. Br. at 22; *Karinski*, 2020 WL 281716, at *1;

---

[12] "[S]ince the Complaint adequately pleads scienter as to the individual executives and directors, this scienter can be imputed to [Metro Bank] as a corporation." *Karinski*, 2020 WL 281716, at *17; *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005).

24

*Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1065-66 (9th Cir. 2000); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008).

### E.   Defendants' Remaining Arguments Also Fail

Defendants' remaining arguments, which rely as a last resort on the doctrines of *forum non conveniens*, international comity, and improper venue, also fail.  Metro Bank's conclusory arguments fail to satisfy its substantial burden of demonstrating extraordinary grounds for dismissal under either comity or *forum non conveniens*.  E.g., *Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813-14, 817 (1976) (comity "is an extraordinary and narrow exception" and court has "unflagging obligation" to hear cases properly before it); *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1236, 1224 (9th Cir. 2011).

Further, similar arguments were rejected by the Supreme Court in *Morrison* and by the Ninth Circuit in *Toshiba I*.  In *Morrison*, the Supreme Court directly confronted and rejected the kind of analysis that Metro Bank presents here, holding that the geographic location of the transaction – and not the location of the fraudulent conduct or its effect – determines where the Exchange Act can be applied without interfering with the interests of a foreign nation.  561 U.S. at 257-59, 269-70.  In *Toshiba I*, the Ninth Circuit followed *Morrison* to hold that comity "is not a basis for declining to follow the Court's clear instructions in *Morrison*." 896 F.3d at 950; *see also Toshiba II*, 424 F. Supp. 3d at 829 ("In light of the court's conclusion that Plaintiffs have sufficiently alleged Securities Exchange Act claims, the court concludes that comity and *forum non conveniens* do not compel dismissal of" Plaintiffs claims.).

## IV.   CONCLUSION

For the reasons set forth above, Metro Bank's motion to dismiss should be denied.

DATED: June 15, 2020          **SCOTT+SCOTT ATTORNEYS ATLAW LLP**


 s/ John T. Jasnoch
John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508

– and –

Thomas L. Laughlin, IV (*pro hac vice*)
tlaughlin@scott-scott.com
Rhiana Swartz (*pro hac vice*)
rswartz@scott-scott.com
Lauren McCabe (*pro hac vice* forthcoming)
lmccabe@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334

*Counsel for Lead Plaintiffs Angelo Lavdas and
Stella Lavdas and Lead Counsel for the Class*

Brian Schall (CA 290685)
brian@schallfirm.com
**THE SCHALL LAW FIRM**
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile:  (310) 388-0192

*Additional Counsel for Lead Plaintiffs*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

Executed on June 15, 2020, at San Diego, California.

s/ John T. Jasnoch
John T. Jasnoch (CA 281605)

LEAD PLAINTIFFS' MEMO. OF POINTS & AUTHORITIES IN OPP. TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 2:19-CV-04739-TJH-JC